MORGAN v. BARNHILL et al.

(Circuit Court of Appeals, Fifth Circuit. October 13, 1902.)

No. 1,136.

1. EVIDENCE OF GOOD CHARACTER—CIVIL ACTION FOR HOMICIDE.
    In a civil action to recover damages for a homicide, which defendant alleges was committed in self-defense, evidence of his good character is not admissible in support of such defense.

2. WRONGFUL DEATH—EXEMPLARY DAMAGES FOR WILLFUL HOMICIDE—LAWS OF TEXAS.
    Under Const. Tex. 1876, art. 16, § 26, which provides that any person or corporation which may commit a willful homicide shall be responsible in exemplary damages to the surviving husband, wife, or children of the deceased, and Rev. St. Tex. art. 3019, which authorizes the recovery of both actual and exemplary damages in such case, where the evidence in such an action justifies the direction of a verdict for plaintiff it is not error to instruct the jury as matter of law to award exemplary as well as actual damages.

3. SAME—ISSUE OF SELF-DEFENSE—SUFFICIENCY OF EVIDENCE.
    In a civil action to recover damages for a willful homicide, defendant's own testimony showed that he brought on the difficulty, used the first

---

¶ 2. Punitive damages for wrongful death, see note to McGhee v. McCarley, 44 C. C. A. 259.

offensive language, and struck the first blow, and that he pursued and shot the deceased while the latter was trying to escape. *Held*, that it was not error for the court to refuse to submit the issue of self-defense to the jury.

In Error to the Circuit Court of the United States for the Western District of Texas.

This is an action for damages brought by Libbie Barnhill, L. Howard Barnhill, and William P. Barnhill against L. T. Morgan. The first plaintiff is the widow, and the other two plaintiffs are the minor children, of Charles Barnhill. It is alleged in the petition that in December, 1900, the defendant, L. T. Morgan, without just cause or provocation, and with malice aforethought, killed Charles Barnhill by shooting him with a pistol. The petition shows the particulars of the killing, showing. that the deceased was unarmed, and that the defendant pursued and killed him while he was begging for his life. The plaintiffs claim actual damages in the sum of $15,000, and exemplary damages in the sum of $15,000. The defendant, L. T. Morgan, answered, denying all the allegations of the petition, giving his version of the difficulty and killing, and alleging that he acted in self-defense. The case was tried on these pleas.

The defendant testified as follows: "My name is L. T. Morgan. I am forty-five years old, and my residence is Plum, Texas. I have been in Texas twenty years. I have been farming, ran a gin, saloon, and merchandising. I was a member of the firm of Morgan & Barnhill. This co-partnership consisted of William Barnhill, Charles Barnhill, J. L. Morgan, W. A. Morgan, and myself. These parties went into partnership about the 10th day of January, 1900. Some time in the spring of 1900—I think it was in the month of February—Richard Ligon came to Will Barnhill and myself and stated that he had been fined $33.50. The firm of Morgan & Barnhill had been selling Ligon on account, so that he might be enabled to put in his crop. He told us that unless we paid this fine for him he would be compelled to go to jail and on the county road, and thus to abandon his crop. I suggested to Will Barnhill that we had better pay the fine and protect ourselves, and to this he agreed. I told him to go ahead and pay it. Some time after that Ligon brought me a receipt, to which I paid no attention, and put it in my vest pocket. Soon afterwards I laid the garment aside, and did not put it on again until cool weather, and in November I happened to go through the pockets and found this receipt, and then, for the first time, I noticed that it was to L. T. Morgan instead of Morgan & Barnhill. The fine and costs of Ligon should have been paid by Morgan & Barnhill, because the firm of Morgan & Barnhill were running him in the store for the year, and it was to the firm's interest to pay his fine, so he could work his crop. When I discovered that Will Barnhill had drawn the check against me alone by the receipt Ligon gave me, which was from the justice of the peace, I went to Will Barnhill in the store and showed him the receipt, and asked him how this was, and whether he had drawn the check against me, Morgan Brothers, or Morgan & Barnhill. He said: 'I do not know. Charlie drew the check. I will go look on the books, and see how it is charged'; and we then went to the books and looked, and it was not charged to Richard Ligon, nor entered on the books anywhere; and Will said, 'When Charlie comes back we will fix it up.' About two weeks afterwards I thought of it, and went to the store and asked Will if he and Charles had fixed that Richard Ligon matter up. He said, 'You told me to draw the check on you.' I told him he was a liar, and Richard Ligon would bear me out in it. I asked Will where Charlie was, and he said Charlie had not come down yet. I went back to the saloon and waited about one-half of an hour or three-quarters of an hour for Charlie to come down. I then went back to the store to see if Charlie had come, and I saw him sitting on a box at the end of a counter in the back end of the store. I walked to where Charlie was sitting, and sat down on the end of the box where he was, and we were both sticking our knives in the box, and I said: 'Charlie, Will says you wrote the Richard Ligon check, and I want to know if you drew it on

me, Morgan Brothers, or Morgan & Barnhill?' He said he knew nothing about it; that he did not write it. Then I got up off the box, closed my knife, put both hands in my pocket, and went upstairs into the office where Will was. I leaned on the end of the desk, and I said to Will, 'What are you and Charles going to do about this check?' 'It looks like you fellows are working for yourselves, and selves alone;' and I understood him to say they were, or something to that effect. And then I struck or slapped him, and he clinched me, and pushed me back a few feet, and I knocked myself loose from him. He then started down the steps, and I came on behind him. As Will left the office and went down the steps Charles Barnhill passed him at the top of the steps. As Charles was going up the steps he passed Will. Charles had a knife in his hand, and struck at me with it, with a hard blow, and I jumped back, and struck at him with my fist. He dodged and became overbalanced, and had to partly run and jump down the steps to the floor to keep from falling. Then he grabbed an ax handle, and started back up the steps, and started to strike at me, and I said, 'Damn you, stop, or I will kill you!' And he didn't stop, and I pulled out my pistol and shot at him. He dropped the ax handle, and ran out the side door, and I followed him. He ran into the cellar from the back door. The cellar was located under the office. I followed right behind him,—in a few feet of him. He ran into the cellar and stopped just to the right of the door. In this cellar was a meat stand, on which we kept bacon, and with this bacon there were always kept two large butcher knives. When I got to the cellar Charles Barnhill was standing by this meat stand, three or four feet from the back door, and a little to the right of the door, and the oil tank was between him and me, and he was about a foot or a foot and a half from the oil tank. I was expecting him to get one of the large butcher knives off of the meat stand and stab me with it, when I first saw his position at the meat stand, and I fired. I did not know which way Will Barnhill had gone, after he left the steps leading from the office. I did not know where he was when Charlie went into the cellar, nor did I know where he was when I came to the back cellar door. The last I had seen of Will, he ran down the steps. There were shot-guns kept on sale in the front part of the store. When he started down the steps he was going in the direction of where the guns were kept. There had never been any kind of unpleasant relations between Will and Charlie Barnhill and myself prior to the time of this difficulty. My object in going to the store was to get this check matter straightened up, and nothing else. Charles and Will Barnhill kept a 45-caliber Colt's pistol in a drawer in the desk in the office. I knew that fact. I did not, after the difficulty in which Charles Barnhill was killed, in the presence of Earl Karnes, Fred Hood, and Mr. McWilliams, on the evening of the killing, or at any other time, say that 'when I came to the cellar door the deceased said, "Crit, don't shoot me;" and that I said, "God damn you, what did you try to cut me for?" and then I pulled the trigger.' I said, 'After I shot Charles Barnhill he said, "Crit, don't shoot me;" and I said, "Damn you, what did you cut me for?".' At no time during the difficulty did I have a knife in my hand."

Cross-examination: "Will Barnhill did not at my direction draw a check to pay Richard Ligon's fine and costs. Will or Charles Barnhill gave Ligon the check, and Ligon went to Le Grange and paid his fine, and brought the receipt back to me, and it showed that the fine and costs were paid by me, but I never noticed it at that time. I noticed it for the first time the next fall, when I put on my winter clothes again, and found it in my pocket. The receipt was in my pocket during all the time, or rather from the time I got it until some time in November, but I was wearing the clothes very little during that time. No, I did not say a word about it to either of the Barnhills until about two weeks before the difficulty, because I had not noticed that the receipt was given in my name. It was about two weeks before the killing before I spoke to them about it. I spoke to Will Barnhill about the matter about two weeks before the killing. I spoke to Will Barnhill about it, and we looked at the books and found that it was not charged upon the books, and he said as soon as Charlie came back we would straighten it up, and I said, 'All right.' I did see Will Barnhill on the day of the killing about a half or three-quarters of an hour prior thereto, and asked him if he had

charged the Richard Ligon fine and costs in the account of Morgan & Barn-hill with Richard Ligon, and he remarked that I told him to draw the check on me to pay Richard Ligon's fine, and I told him it was a lie, and I could prove it by Richard Ligon. I do not remember if he was waiting on some ladies in the store at the time. I returned to the store in about a half or three-quarters of an hour. I wasn't mad, but I was a little bothered about it, and, as Will claimed that Charlie wrote the check, I still thought that Charlie would do what was right about it. I did have a six-shooter on when I went to the store, and had it on all that day. When I came to the store the second time I saw Charles Barnhill first. I showed him the receipt of the Richard Ligon fine, and he said he did not write the check and didn't know anything about it. He did not tell me that Will Barnhill was keeping the books, but I knew as a fact that Charles Barnhill kept the books. I then started to the office where Will Barnhill was. After I left Charles Barnhill I did not stop and turn to him and say, 'By God, the Barnhills seem to be looking out for their own interests.' But when I got up in the office where Will was I said: 'Will, what are you going to do about this check? It looks like you boys are working for yourselves, and selves only;' and when I said this I was angry, and was talking only to Will Barnhill, and I was mad when I said it. When I got to the office, where Will Barnhill was, I did not ask him if he had charged that item up to Richard Ligon's account. He had not told me that he had not done so, and I did not then strike him with my fists two or three times. I asked him: 'What are you going to do about this check? It looks like you boys are working for yourselves, and selves only;' and I understood him to say he was. I then struck him with my fist or hand only once. I was then between Will Barnhill and the only exit from the office. He then grabbed me and pushed me back two or three feet, and I knocked him loose from me, and he got by me and went down the steps out of the office. The fuss was stopped, and we were both going down-stairs, and I met Charles Barnhill, and was stopped by him. When Will Barnhill and myself were going out of the office I met Charles Barnhill at the top of the steps, and he struck at me with a knife, and I jumped back and struck at him with my fist, and he dodged my lick, and he partly jumped and ran down the steps to the floor to keep from falling. When he dodged my lick, and jumped and ran down the steps, he picked up an ax handle and started back up the steps towards me, and I then drew my pistol and said, 'Stop, or I will kill you,' and I then shot at him. I shot at no particular part of his body. I intended to kill him or make him stop. When he jumped down the steps to pick up the ax handle, I think he put the knife in his pocket. I do not know if he had the knife in his hands when he started up the steps with the ax handle. After Charles Barnhill's dead body was brought out of the cellar, and was lying on the floor, I did not feel in his pockets, or of his pockets, to see if he had a knife in his pockets. When I shot at Charles Barnhill I was up on the office floor, and this floor is five or six feet higher than the store floor, and Charles Barnhill was about half way up the office steps, coming to me. I was not afraid of the Barnhills. Charles Barnhill ,weighed from 135 to 145 pounds, and I weighed about 195 pounds, and I am a strong and active man. I could not take Charles Barn-hill and tie him. When I shot at Charles Barnhill he dropped the ax handle and ran down the steps, and ran out the side door, and I did not see a knife in either of his hands when he ran out of the back or side door, and I fol-lowed him with my pistol in my hand, and he was running from me, and he ran into the cellar at the outside door, at the rear of the store. When I got to the cellar door, I looked in and saw Charles Barnhill, but he was not crouching behind a large oil can, as if to hide from me. He was standing up by the meat stand, where two six-inch blade butcher knives were always kept. He was not leaning up against the wall, with his hands upon it. After he was shot he said, 'Crit, don't shoot me;' and I then said, 'Damn you, what did you cut me for?' When I accused him of cutting me I did not accuse him falsely, because I honestly thought he had cut me. After I shot Charles Barnhill he said, 'Crit, don't shoot me;' and I said, 'Damn you, what did you cut me for?' He was standing up by the meat stand, a little bent, as if he was going to pick up something, or had picked up some-

thing. He was standing with his side to me, and looked at me. When I shot him I intended to kill him, because I thought he was fixing to stab me with a butcher knife. After I shot Charles Barnhill I stepped into the cellar. After I walked halfway across the cellar I saw Will Barnhill, and said to him, 'You are the cause of all this trouble,' and struck him twice with my pistol. He had a barrel augur in his hand, but I do not know whether he had it before I struck him or not. He was not going to his dead brother. When I struck him with my pistol I did not knock him down, and do not think I broke his skull. He did not come near dying from the effects of the blows. I had quit striking him when my brothers took the pistol away from me. When I killed Charles Barnhill and assaulted Will Barnhill I did it in self-defense, as I thought they were trying to kill me, and I regret that I had to do it. When Will Barnhill left the office I do not know where he went. The firearms that were in the store of Morgan & Barnhill were kept there for sale, and were located in the forward part of the store. My brother John Morgan was in the storehouse while the difficulty was going on, and he and my brother Will took my pistol away from me after I had quit striking Will Barnhill. I have not called on my brother John Morgan to testify for me in this case nor in the case of murder, because he doesn't know any material facts in the case. Will Barnhill had authority to draw checks for Morgan & Barnhill, but not for L. T. Morgan or Morgan Brothers, only when we told him so. I followed Charles Barnhill about twenty feet to where I killed him, thinking he was going to get something to attack me with."

The court instructed the jury to return a verdict in favor of the plaintiffs for both actual and exemplary damages. The defendant duly excepted to this charge. The jury returned a verdict for $10,000 actual damages and $10,000 as exemplary damages. This judgment, amounting in the aggregate to $20,000, was reduced by remittitur to $15,000. Judgment being entered, Morgan sued out this writ of error.

The material assignments of error are that the court erred (1) in rejecting evidence of the defendant's good character; (2) in instructing the jury to find a verdict for exemplary damages; and (3) in refusing to submit the question of self-defense to the jury.

H. M. Garwood, Brown, Lane & Garwood, and Wolters, Lane & Lenert, for plaintiff in error.

J. T. Duncan, Miller & Fiset, and Robson & Duncan, for defendants in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge, after stating the case as above, delivered the opinion of the court.

1. In criminal cases good character may be proved by the defendant as tending to sustain the plea of not guilty, but in civil cases such evidence is, as a general rule, held irrelevant. This is a civil suit between private parties. We find no reason for departing from the general rule which makes evidence of the character of the parties inadmissible. 1 Whart. Ev. § 47, and cases there cited. The rule would, of course, be different in a civil case where the character of a party was at issue. Id. § 48. The circuit court ruled correctly in excluding the evidence offered as to the character of the defendant. Givens v. Bradley, 3 Bibb, 192, 6 Am. Dec. 646.

2. It is assigned as error that the trial court instructed the jury to find a verdict against the defendant for exemplary damages. The contention is that exemplary damages are never a matter of right, but are always in the discretion of the jury. Many cases are cited as tending to sustain this view, but we need not comment on them, the question here being controlled by the constitution and statutes of

Texas. Section 26 of article 16 of the constitution of 1876 is as follows:

"Every person, corporation, or company that may commit a homicide through any willful act or omission or gross neglect, shall be responsible in exemplary damages to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide."

Articles 3017 to 3019 of the Revised Statutes of Texas are as follows:

"An action for actual damages on account of injuries causing the death of any person, may be brought in the following cases: * * * (2) When the death of any person is caused by the wrongful act or negligence, neglectfulness or default of another.

"Art. 3018. The wrongful act, negligence, carelessness, neglectfulness or default mentioned in the preceding article, must be of such character as would, if death had not ensued, have entitled the party injured to maintain an action for such injury.

"Art. 3019. When the death is caused by the wilful act or omission, or gross negligence of the defendant, exemplary as well as actual damages may be recovered."

The express statutory law which authorizes this action provides that for a willful homicide the wrongdoer shall be responsible for "exemplary damages" as well as for "actual damages." If it be conceded that the plaintiff in error is right in his contention as to the general rule in the absence of an express statute, we think the court below, in view of these statutes, properly declared the law. The evidence of the defendant himself showed that the killing was willful and wholly unjustifiable, and he is therefore liable for both actual and exemplary damages.

3. Several assignments of error relate to the question of self-defense. It is claimed that the trial court should have submitted the question whether or not Morgan acted in self-defense to the jury. Morgan was a witness for himself on the trial, and gave an account of the circumstances under which he killed Barnhill. It is to be presumed that he stated the case as favorably to himself as the facts justified. In the statement of the case we have embodied Morgan's evidence. It shows that he brought on the difficulty. He used the first offensive language. He struck the first blow. He then pursued Barnhill and killed him while he was defenseless and trying to escape. In such a case the doctrine of self-defense has no application. There is other evidence in the case showing that Barnhill was begging for his life when Morgan shot him. But, looking alone at Morgan's statement, the facts recited by him show that he was the aggressor, and that his act was willful and unlawful. In view of his statement, the case should be affirmed, even if there was evidence of some other witness which, standing alone, might present the question of self-defense. It would be trifling with the administration of the law to allow him a new trial in which to present the question of self-defense to the jury, when in effect he has stated under oath that he did not act in self-defense, and that he is guilty of the charge preferred against him. Motes v. U. S., 178 U. S. 476, 20 Sup. Ct. 993, 44 L. Ed. 1150.

The judgment of the circuit court is affirmed.