[L. A. No. 2509. In Bank.—June 6, 1911.]

## M. W. DAVIS, Respondent, v. WILLIAM RANDOLPH HEARST et al., Appellants.

CIVIL LIBEL—MALICE—COMPENSATORY DAMAGES.—Under the law of civil libel, as defined in section 45 of the Civil Code, malice forms no ingredient of the offense, and a recovery of full compensatory damages may be had in every case, even where it is not pleaded or proved, and where an absence of malice is positively established.

ID.—CRIMINAL LAW—MALICE NECESSARY INGREDIENT—PRESUMPTION.— In the criminal law malice is made a necessary ingredient of the offense of libel, as defined in section 248 of the Penal Code, though

to make *prima facie* proof of it it is only necessary for it to appear that an injurious publication has been made without justifiable motive. Thereupon the law raises a presumption of the malice sufficient to support the criminal charge.

ID.—LIBEL AS RESULT OF INADVERTENCE.—If a civil libel results from mere inadvertence, from a proof reader's or compositor's error or from any clerical misprision, the liability upon the publisher is just as great and no greater for compensatory damages than the liability that would be cast upon him if the same publication were most evilly and malignantly designed.

ID.—MALICE DEFINED — MALICE IN FACT — EVIDENCE TO ESTABLISH.— Malice as universally understood by the popular mind has its foundation in ill-will and is evidenced by an attempt wrongfully to vex, injure, or annoy another. This malice may be designated malice in fact, and is the malice described in subdivision 4 of section 7 of the Penal Code, where it is said: "The words 'malice' and 'maliciously' impart a wish to vex, annoy, or injure another person." This malice may be established either by direct proof of the state of mind of the person or by indirect evidence so satisfying to the jury that they may from it infer and find the existence of this malice in fact.

ID.—MALICE IN LAW—PRESUMPTION.—There is still another malice, the presumption of the existence of which is raised by the law in certain cases upon certain proof. This is the malice described in the same section of the Penal Code, when it further declares that "malice" is shown by "an intent to do a wrongful act, established either by proof or presumption of law." This malice may exist with malice in fact, or it may exist quite independently of it. In some instances this latter malice—malice in law—is conclusively presumed against the defendant. In other instances the presumption is disputable.

ID.—EXPRESS OR IMPLIED MALICE DEFINED—EVIDENCE—PUNITIVE DAMAGES.—Under section 3294 of the Civil Code, providing for the award of punitive damages in any action sounding in tort "where the defendant has been guilty of oppression, fraud, or malice, express or implied," the malice, and the only malice, there contemplated is malice in fact, and the phrase "express or implied" has reference only to the evidence by which that malice is established; express malice thus meaning that the malice is established by express or direct evidence going to prove the actual existence of the hatred and ill-will; implied malice referring to the indirect evidence from which the jury may infer the existence of this malice in fact.

ID.—MALICE IN FACT ESSENTIAL TO AWARD OF EXEMPLARY DAMAGES— EVIDENCE TO PROVE.—While such malice in fact is essential to an award of exemplary damages, it may be proved directly or indirectly, —that is to say, by direct evidence of the evil motive and intent, or by legitimate inferences to be drawn from other facts and circumstances in evidence.

ID.—PRIVILEGED PUBLICATIONS.—Where the Civil Code, in section 47, speaks of privileged publications and, in section 48, declares that malice is not inferred from the publication of such matters, it has reference to this malice in fact.

ID.—EVIL MOTIVE—FRAUD OR OPPRESSION.—In all cases in which exemplary damages are sanctioned, there must be made to appear to the satisfaction of the jury the evil motive, the *animus malus*, shown by malice in fact or by its allied malignant traits and characteristics evidenced by fraud or oppression.

ID.—LIABILITY OF PRINCIPAL FOR PUNITIVE DAMAGES FOR ACTS OF AGENT. —A principal cannot be held in punitive damages for the act of his agent unless the particular act comes within the principal's specific directions or general suggestions or unless the principal has subsequently ratified it, such ratification presupposing original authorization.

ID.—LIABILITY OF NEWSPAPER PROPRIETOR — GENERAL INSTRUCTIONS.— Under general suggestions would come that class of cases where the policy and conduct of a newspaper show that its proprietor has given his subordinates *carte blanche* to do anything and everything that will make the paper a financial success and demonstrate its superior enterprise as a news disseminator.

ID.—BURDEN OF PROOF OF MALICE IN FACT—QUESTION FOR JURY.—Since malice in fact goes to the state of mind and evil motive of the defendant, the burden of proving the existence of that state of mind is in every case upon the plaintiff who seeks an award of punitive damages based upon its existence. The fact is to be determined by the jury, though there is always the reserved power and duty in the court, in a proper case, to instruct the jury that there is such an absence of evidence of the malice in fact as to forbid an award in punitive damages.

ID.—EVIDENCE OF MALICE IN FACT.—In proof of malice in fact, the evidence may be direct (or express, as the code names it), going to declarations, acts, and conduct of the defendant, showing personal ill-will towards the plaintiff, but it will more usually be indirect or inferred (the implied malice in fact of the code definition), and to this end of proving the malice inferentially all legitimate evidence is admissible bearing upon the general course of conduct of the defendant toward the plaintiff, the internal evidence furnished by the character of the libel, and any other specific facts and circumstances not in direct proof of the malice, but from which the existence may be logically inferred, herein including the circumstance, if it be found to exist, of wanton recklessness and heedlessness of plaintiff's rights. When such malice is found to exist, an award based upon it should bear relation to its gravity.

ID.—MALICE IN FACT NOT PRESUMED.—Malice in fact does not arise as a legal presumption from the mere falsity and libelous character of the publication. It may be inferred from the intrinsic evidence of malice

CLX Cal.—10

which the publication affords; but whether it does or not is for the jury to say.

ID.—PRESUMPTIONS AS TO UNLAWFUL ACTS.—The presumptions that an unlawful act was done with an unlawful intent, and that a person intends the ordinary consequences of his voluntary act, are, in libel, presumptions going to malice in law and not to malice in fact.

ID.—PRESUMPTION OF MALICIOUS INTENT.—The only presumption touching malice in fact is that announced in section 1962 of the Code of Civil Procedure, which declares as a conclusive presumption "the existence of a malicious and guilty intent, from the deliberate commission of an unlawful act, for the purpose of injuring another." Before this presumption arises, the jury must find as facts: (1) the commission of an unlawful act; (2) that its commission was deliberate, and (3) that it was committed with the deliberate purpose of injuring another.

ID.—ABSENCE OF NEWSPAPER PROPRIETOR—LIABILITY FOR PUNITIVE DAMAGES—SERIES OF LIBELOUS PUBLICATIONS.—The mere fact that the proprietor of a newspaper was absent from the scene of the libelous publication at the time of the publication, did not actually participate therein, and had no knowledge of any of the acts complained of, is not sufficient of itself to preclude the award of punitive damages against him. The existence of malice in fact could be inferred from the fact that a series of libelous articles had been published in the newspaper reflecting upon the plaintiff's official and personal character and conduct, and that the proprietor had affirmed the truth of the charges by justification in his answer.

ID.—JOINT TORT FEASORS—APPORTIONMENT OF COMPENSATORY DAMAGES.—In an action for compensatory damages against joint tort feasors, under section 3333 of the Civil Code, an apportionment of the damages is not permitted, since the law will not attempt to measure the degree of culpability of the joint tort feasors. The same rule obtains in an action for malicious prosecution where the existence of malice in fact must be found against every tort feasor before any judgment can be rendered against him.

ID.—APPORTIONMENT OF PUNITIVE DAMAGES.—There is nothing in the law of this state to prevent an award of compensatory damages against all joint tort feasors who are found culpable, and to add a specific sum or sums by way of punitive damages, against such of the tort feasors as the jury shall find to have been actuated by malice in fact.

ID.—INSTRUCTION—ABSENCE OF NEWSPAPER PROPRIETOR—MEASURE OF DAMAGES.—In an action for libel an instruction that the "proprietor of a newspaper in which a libel is published though he has no knowledge of the publication at the time, is as responsible for it as he would have been had it been done by him personally or under his direct supervision, and it is no defense to a libel that it was published in the absence of the proprietor by an employee, however

competent said employee may be," although unobjectionable as the
rule governing the award of compensatory damages, is misleading
if given as the rule of law governing the award of punitive damages.

ID.—ERRONEOUS INSTRUCTIONS AS TO EXPRESS AND IMPLIED MALICE.—
In such action instructions which in effect define express malice to be
malice in fact, and implied malice to be malice in law, and declare
that exemplary damages could be awarded by the jury upon a
finding of either malice in fact or malice in law, are erroneous.

ID.—NEGLIGENCE NOT EVIDENCE OF MALICE IN FACT.—Mere negligence
or carelessness can never be evidence of malice in fact, so as to justify
an award of punitive damages in an action for libel.

ID.—PUNITIVE DAMAGES NOT MATTER OF RIGHT.—Even after establishing
a case where punitive damages are permissible, a plaintiff is never
entitled, as matter of right, to recover them, and an instruction
that he is so entitled is erroneous. The granting or withholding of
such damages is wholly in the discretion of the jury.

ID.—CIRCUMSTANCES IN MITIGATION.—Circumstances in mitigation are
allowed to be pleaded and proved in an action for libel usually to
overcome evidence of malice in fact. They ordinarily have no other
place or purpose, the exception being the use of evidence in mitiga-
tion to rebut evidence of special damages and evidence of bad
reputation to lessen the award in compensatory damages.

ID.—INSTRUCTIONS AS TO PRESUMPTION OF MALICE IN FACT—INFERENCE
OF FACT.—Malice in fact in an action for libel is never presumed,
but is always to be proved, and an instruction which is predicated
on the contrary is erroneous. The law merely declares that by proof
of the unprivileged character of a publication, libelous *per se*, the
jury may infer the existence of such malice. This inference is
always an inference to be drawn by the jury, and is not a presump-
tion which the law has made or which the court can make for the
control of a jury.

ID.—REPUBLICATION OF LIBEL IN ANSWER—EVIDENCE OF MALICE IN FACT
—INSTRUCTION.—The fact that the defendant in his answer repub-
lishes the libelous charge, and at the trial failed to prove its truth,
and did not in good faith expect to do so, can be considered by the
jury only as evidence of the existence of malice in fact to support an
award of punitive damages. An instruction, however, is not to be
deemed misleading merely because it stated that by such conduct
the defendant "intensifies the original wrong."

ID.—IMPEACHING REPUTATION OF PLAINTIFF—EVIDENCE OF RUMORS INAD-
MISSIBLE.—In an action for libel the defendant may impeach the
reputation of plaintiff generally or as to the particular qualities
embraced in the libel for the purpose of reducing compensatory dam-
ages, but he may not do this by showing either rumors of general
ill-repute or rumors of ill-repute as to the particular matter charged
in the libel. Nor can the existence of the rumor be shown to negative
malice, even if the statement in the libel be predicated upon the
existence of such rumor.

ID.—PERSON REFERRED TO IN LIBEL—UNDERSTANDING OF READERS—IN-
TENT OF DEFENDANT.—Where a libelous newspaper article is am-
biguous as to the person to whom it was meant to apply, it is for
the jury to determine, and they may be instructed to so determine,
whether the article would be understood by the readers of the news-
paper as referring to the plaintiff. Testimony of outside readers
on this point is not required, the jurymen themselves becoming the
readers. If the article would be so understood, the defendant is
liable irrespective of his intent.

ID.—GOOD REPUTATION OF PLAINTIFF.—EVIDENCE OF INADMISSIBLE PRIOR
TO ATTACK.—In an action for libel, affirmative evidence of the plain-
tiff's reputation in advance of any attack upon it by the defendant
is inadmissible. In the absence of such an attack, the defendant is
entitled to have the case of the plaintiff rested upon the presumption
of good reputation which the law accords.

ID.—AFFIRMATIVE EVIDENCE OF FALSITY OF LIBEL.—While the falsity of
defamatory matter will be presumed, still it is competent for the
plaintiff, if he so desires, to offer affirmative evidence showing that
falsity.

ID.—LIBEL OF CITY OFFICIAL—EVIDENCE OF INVESTIGATION BY MAYOR.—
Where the libelous article stated that the mayor of a municipality
had investigated the charges made by the newspaper against the
plaintiff as a city official and had found them to be true, the evidence
of the mayor is admissible, not on the question of the truth or falsity
of the charges themselves, but upon the question whether he did find
the exposures to be true and did so report.

ID.—HEADLINES OF LIBEL.—The captions and headlines of a libelous
newspaper article are themselves a part of the libel.

ID.—PLEADING JUSTIFICATION AND MITIGATION—EVIDENCE.—Under sec-
tion 461 of the Code of Civil Procedure, if a defendant pleads justi-
fication, he may at the same time plead with his affirmance of good
faith and honest belief all facts and circumstances within his knowl-
edge at the time of the publication which support that knowledge
and belief, even if they tend to establish the truth of the charge.
If he desires to plead justification, and also the truth or partial
truth in mitigation, he must plead these facts and circumstances in
mitigation, in which event they will be considered. Even if the
justification fails, these matters will be considered by the jury upon
the question of malice.

ID.—EVIDENCE TENDING TO PROVE TRUTH OF CHARGE.—Under that sec-
tion, evidence tending to prove the truth of the charge may be
proved, but must be pleaded. All other circumstances in mitigation
may be so proved without pleading them.

ID.—TRUTH GIVEN IN MITIGATION—KNOWLEDGE OF DEFENDANT.—There is
this broad distinction between a plea in justification and evidence of
the truth given in mitigation: the truth whenever discovered is a com-
plete defense, but to repel the conception of malice in the publica-

tion, only so much of the truth as the defendant knew at the time of the publication can avail him.

ID.—INSTRUCTIONS—QUALIFIED PRIVILEGE.—In an action for libel, the court should not give an argumentative instruction on the question of qualified privilege as a defense, when no such question of privilege is involved in the case.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. F. W. Houser, Judge.

The facts are stated in the opinion of the court.

Davis & Rush, Garret W. McEnerney, and Andrew F. Burke, for Appellants.

J. H. Merriam, and Edwin A. Meserve, for Respondent.

HENSHAW, J.—Plaintiff brought this action to recover damages for certain alleged libelous matters published of and concerning him in the Los Angeles *Examiner.* Of the defendants, W. R. Hearst is the proprietor and publisher of the paper, Henry Lowenthal the business manager, and James T. Belcher a reporter and author of the defamatory articles. Trial was had before a jury. The action was dismissed as to the defendant Lowenthal, and proceeded to verdict and judgment against the remaining defendants. The verdict awarded plaintiff compensatory damages in the sum of ten thousand dollars, and exemplary damages in the sum of twenty-five thousand dollars, against both defendants. The judgment followed the verdict.

The complaint contained three causes of action, based upon three separate publications, one and all directed against the acts and conduct of plaintiff as a member of the board of education of the city of Pasadena and the clerk of that board. The first publication was made upon September 13th, under headlines declaring that the

"SCHOOL BOARD FACES RIGID INVESTIGATION.
"Demand for Inquiry into Mismanagement and Waste
of Public Money May be Made."

The article itself purported to deal with the exposure which

the *Examiner* had made "of the extravagance and reckless, if not criminal, waste, of public school funds by the Pasadena board of education." It declared that it was an easily demonstrated fact that there had been bad management "if nothing worse" in connection with the erection of almost every school building during the past few years, and that rumors had been rife for many months reflecting upon the management of the public business by the board of education. It asserted that the school board "had been braggingly active in politics," had furnished misleading reports to the press, and that charges of favoritism in the awarding of public contracts had been hinted at time and time again. It asserted the existence of a growing distrust amongst the people touching the management by the board of education of the affairs entrusted to it. It declared that whenever there had been such a report of trouble in connection with the construction of a new school the secretary, M. W. Davis, and other members of the board, when appealed to, falsely asserted that there was nothing amiss, and that "Something more than mere denial will be necessary to explain the waste of so many thousands of dollars in the Garfield School, money which was wasted as completely as if it had been actually thrown into the public streets." It also declared that as soon as the *Examiner's* exposure became known, the board of education put in practice its "usual tactics" of making excuses through a friendly press, "with the evident purpose of hiding the real seriousness of the case." It stated that "the *Examiner's* articles have charged plainly and unqualifiedly" certain enumerated matters showing extravagance, incompetency, and waste of the public funds.

The second cause of action sets forth the publication of another article upon the day following, which is here quoted at length.

"School Graft Would Make a Ruef Blush.
"Pasadena Citizen Declares Education Board Has
Juggled Funds for Years.

"Pasadena, Sept. 14.—No matter what may be the outcome of the evident waste of public funds by the board of education, there is hope that the people of Pasadena have at last awakened to the necessity of demanding a more general and satisfactory explanation of the way the school board attends to its public duties. There is no longer any concealment of

the fact that there have been ugly stories afloat concerning the alleged misconduct in office of men who were expected to be protecting the public school interests. It is true that there have been allegations of 'graft' made freely in connection with almost every expenditure of the school funds for several years past, both with the present and previous boards of education.

"The members of the board at present are Benjamin E. Page, who is also president; M. W. Davis, who is the clerk; C. E. Chamberlain, J. B. Beardsley and W. W. Ogier. The last two were elected recently to succeed D. W. Lewis of North Pasadena and C. M. Parker, who had served terms of four years each. Messrs. Ogier and Beardsley have had nothing to do with the erection or awarding of contracts for the building of any new schools since their induction in office, although they are officially connected with the later questionable transactions at the Garfield schools.

"With the uncovering of the manner in which money has been expended in this connection, there is a revival of alleged mismanagement and waste of public money at other school buildings. These reports are numerous. At the Lincoln School, for instance, the fact is pointed out that sewer pipe of vitrified brick was laid in face of the advice of men familiar with such work and such material. The school board was advised to install iron pipes that would last a lifetime, but they decided to lay vitrified brick. Even Contractor Buckins, who had the job, recommended iron pipes, which would have cost but a small sum more than the brick. No attention was paid to these recommendations, and after a period of about three years new pipe had to be laid to replace the original pipe, as the latter had become worthless.

"At the McKinley School even a more serious mistake was made, a mistake that imperiled the health of several hundred children. 'Fresh air' was carried into the school rooms that was carried across the heaters in the toilet rooms.

" 'The simple fact is,' said City Electrician William H. Reeves, who has had much to do with the new school buildings in connection with his official duties, 'that the condition of affairs in the different school buildings is simply rotten. That is all there is to it.'

"As usual, it is difficult to have proper officials discuss the situation for publication, but a man familiar with the board of

education's method of doing business during the past four years, said to-day to the *Examiner* correspondent:

" 'Every well informed citizen in Pasadena is aware that school funds have been recklessly wasted for years past. The members of the board seem to feel that they are not responsible to anybody for what they may do. They prate of providing for the future needs of the schools, while as a matter of undeniable fact, they have never kept within years of the present needs. There has been scandal in connection with every school building erected in recent years, members of the board have scorned the advice of men informed as builders and architects, and yet they seem never to have profited by their past mistakes. If some citizens of standing would bestir themselves and force an open and public investigation, some of these gentlemen of the school board might feel inclined to hang their heads in shame. It is simply incredible that the taxpayers will tolerate the misuses of money that should go for the education of the boys and girls in this city. Every dollar that is wasted, as money has evidently been wasted in the Garfield schools, is nothing more or less than robbing the rising generation of just that much educational opportunity.

" 'The great trouble here has been that a certain element or clique of men, whose integrity is not so immaculate that we may not even look at it, have sneered at the people and laughed at all opposition and all questioning of their public acts as members or officials of the board of education. It is only a few years ago that members of the board begged the taxpayers for funds for new schools, specified plainly what they wanted the money for and after getting it voted to their uses as outlined by them, they deliberately used the money for other purposes. These men are prone to talk of their integrity, but such misrepresentations and juggling of public funds would make Abe Ruef blush for shame. If the members of the board of education are under bonds for the efficient discharge of their public duties they should be proceeded against. If they are not under bonds, they should be compelled to give them or be forced to resign from office.

" 'M. W. Davis, clerk of the board, is generally regarded as the worst offender against the public interests in connection with the schools. It is charged against Clerk Davis as an example of his manner of discharging his official duties, that

in the year 1905 he was notified by Building Inspector A. C. Shaver that the plumbing in the Franklin School, that was at that time in course of construction, was not good or sanitary, and that at the time of the final inspection he would be compelled to condemn it. The building inspector also took occasion to notify Clerk Davis that the specifications were not being lived up to, and that the material being used was not up to the quality called for. This notice was served in writing and after verbal notice had been given. No attention was paid, as usual, but when the plumbing was condemned by the city's inspector of buildings, as he had notified Davis would be done, the work was changed and done over again after the building had been practically completed.' "

The third cause of action charged upon a publication made upon October 7th following, whose headlines read as follows :—

"MAYOR INVESTIGATES THE BOARD OF EDUCATION'S ACTS.

"Exposures Made by *Examiner* Found to be True.

"Pasadena Council Will Act."

The body of the article declared that as a result of the exposures made in the *Examiner* in regard to the loose manner of "doing business that has been in vogue in the board of education, it is reported tonight that the city council will be asked at its meeting tomorrow to enforce more stringent regulations to protect the taxpayers.

"Upon information obtained from the *Examiner* Mayor Earley on Saturday afternoon visited the office of City Auditor and Assessor Kellogg and inspected the bills filed in that office by M. W. Davis, member and clerk of the board of education.

"The mayor found that Clerk Davis has been making copies of all bills submitted to him, that he approves the same, swears to their correctness, and it is said, has been collecting the money and making it his personal business to pay the person holding the claim against the board of education. The mayor was doubtful that such a loose practice was in vogue, but a brief conference with Auditor Kellogg convinced him of the truth of the statements that have been made in the *Examiner* in this connection."

The complaint contained appropriate innuendoes as to the meaning of the alleged libelous matter and of its designed application to plaintiff, and charged that it was published with

express malice on the part of each of the defendants directed against the plaintiff.

The answer by denial raised the general issue. It pleaded also justification and certain matters in mitigation. It pleaded the absence of Mr. Hearst from the city of Los Angeles and from the State of California at the time of these publications, and his employment during his absence of skilled, careful, and competent men, and that the defendant James T. Belcher was such a man. Defendants all joined in one answer, and it was specifically averred that neither the defendant Hearst nor the defendant Lowenthal had any personal knowledge whatsoever of the publication of the articles or of the statements therein contained.

The questions brought up for review upon appeal are numerous. It is impossible even to enter intelligently upon their consideration in advance of a clear understanding of certain fundamental principles, propositions, and even words, which throughout must guide, control, and govern the discussion. And it should be said that this discussion, except where it is otherwise specifically pointed out, is addressed to the civil law of libel. For at the outset it is to be remembered that not only are the defenses to a criminal libel different from those permissible in a civil action of libel, but the very definitions of civil and criminal libel vary radically. A libel upon which a civil action may be founded is:

"A false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, sec. 45.)

A libel as the foundation for a criminal action is "a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue, or reputation, or publish the natural or alleged defects of one who is alive, and thereby to expose him to public hatred, contempt, or ridicule." (Pen. Code, sec. 248.)

Under our law of civil libel, as appears from the foregoing definition, malice forms no ingredient of the offense, and a recovery of full compensatory damages may be had in every

case, even where an absence of malice is positively established. Upon the other hand, in criminal law, malice is made a necessary ingredient of the offense, though to make *prima facie* proof of it is only necessary for it to appear that an injurious publication has been made without justifiable motive. Thereupon the law raises a presumption of the malice sufficient to support the criminal charge. (Pen. Code, sec. 250.)

Malice, as has been said, is not a necessary ingredient of a civil libel nor essential to the full recovery of compensatory damages. If a libel results from mere inadvertence, from a proof reader's or a compositor's error, or from any clerical misprision, the liability of the publisher is just as great and no greater for compensatory damages than the liability that would be cast upon him if the same publication were most evilly and malignantly designed. (Civ. Code, sec. 3333.) Thus we are brought at the outset to a consideration of the part which malice plays in actions for civil libel. Because of the many definitions which have been given to this word, of the many varying attributes which have been accredited to it, of the many jurisdictions which have been called upon to deal with the law under as many different definitions of libel itself, because, also, of the inevitable confusion which has arisen by a failure carefully to distinguish between the law of civil libel and the law of criminal libel, and, finally, because of the decisions of those jurisdictions where punitive or vindictive damages have been or are allowed without an express statute controlling the award, the word "malice," it has been aptly said, has come to be the "bugbear of the law of libel." Says Gaynor, J.: "The jumble in some modern text books on slander and libel concerning malice, actual malice, malice in law, malice in fact, implied malice, and express malice (all derived from judicial utterances, it is true) is a striking testimony of the limitations of the human mind." (*Ullrich* v. *New York Press Co.*, 23 Misc. 168, 171, [50 N. Y. Supp. 788, 790].) Says a learned judge in *Abrath* v. *North Eastern R. Co.*, 11 App. Cas. 247, 253: "That unfortunate word 'malice' has got into cases . . . for libel. We all know that a man may be the publisher of a libel without a particle of malice or improper motive. Therefore the case is not the same as where actual and real malice is necessary. Take the case where a person may make an untrue statement of a man in

writing, not privileged on account of the occasion of its publication; he would be liable although he had not a particle of malice against the man." And in 4 Odgers on Libel & Slander, p. 320, it is said: "It is true that the word 'malicious' is usually inserted in every definition of libel or slander, that the pleader invariably introduces it into every statement of claim, and that the older cases contain many *dicta* to the effect that 'malice is the gist' of an action of libel or slander. But in all these cases the word 'malice' is used in a special and *technical* sense; it denotes merely *the absence of lawful excuse;* in fact, to say that defamatory words are malicious in that sense means simply that they are unprivileged, not employed under circumstances which excuse them. But I have thought it best to drop this technical and fictitious use of the word altogether—a use which has been termed 'unfortunate' by more than one learned judge."

*Malice in law and malice in fact.*

It has been said, and cannot be said with too much emphasis, that a full recovery in compensatory damages may be had under our civil law of libel without the pleading of malice, without the proof of malice, and without the existence of malice. The doctrine that malice is the gist and essence of a charge of libel grew up in those jurisdictions where the definition of a wrong embraced the element of malice, as it still does in this state in the definition of criminal libel, and thus we find in our own cases such language as the following: "Malice in law may be defined as a wrongful act done intentionally without just cause or excuse. Such malice is necessary to the life of every cause of action for libel, and is conclusively presumed in publications of the character here involved." (*Childers* v. *Mercury Pub. Co.,* 105 Cal. 284, [45 Am. St. Rep. 40, 88 Pac. 903].) In endeavoring to follow this case, the learned commissioner in *Taylor* v. *Hearst,* 107 Cal. 262, [40 Pac. 392], declares: "To constitute libel there must be malice, actual or implied, on the part of the publisher. Actual malice exists when the publication is made through motives of ill-will, and with intent to injure or defame, and the law presumes malice when the article published is libelous *per se.* Such malice is called malice in law, and it signifies a wrongful act intentionally done." But as an evidence of the inextricable confusion which has arisen from the use of this word, it may be pointed

out that in that case, while it is seemingly declared that malice existed, and that it is known as malice in law, elsewhere in the opinion it is stated that it was proved that the publication was made "by mistake and without any malice toward the plaintiff." The case itself is illustrative of the declaration that malice is not an essential to our civil law of libel, and that plaintiff's right to recover is based simply upon the tort and the damages which it has caused him, even though the tort consist of negligence pure and simple. In *Taylor* v. *Hearst* the libelous article charged a fraud upon the public in connection with furnishing basalt blocks to the city, and accused J. W. Taylor of the fraud. A mistake had occurred. J. W. Taylor had no connection with the fraud. J. N. Taylor was the person meant to be charged. A prompt retraction and explanation was made by the newspaper upon discovery of this typographical error, completely exonerating J. W. Taylor. In the action brought by J. W. Taylor all these facts were established, with many more, showing the care of the paper in gathering the news and presenting it to the public, and by this court it was said that the libel was based wholly upon a mistake "without any malice toward the plaintiff, the middle initial of Taylor's name being printed 'W', when it should have been 'N'." An oft quoted definition of malice in law is that it is a wrongful act done intentionally without just cause or excuse. It is plain that the act of defendant in *Taylor* v. *Hearst* did not in fact measure up to this definition, since the wrongful act was done not intentionally, but unintentionally.

But in law the act did measure up to the definition, since the publication (the act) was wrongful, was intentional, and the defendant would not be permitted to rebut the presumption of malice in law by proof that the publication was misdirected.

The truth is that an understanding of the law of civil libel has been much embarrassed by this fiction of legal malice. And still more has the law been complicated by the varying definitions which have been given of this legal malice.

Malice as universally understood by the popular mind has its foundation in ill-will, and is evidenced by an attempt wrongfully to vex, injure, or annoy another. This malice may be designated malice in fact. It is the malice described

in subdivision 4 of section 7 of the Penal Code, where it is said: "The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person. There is still another malice, the presumption of the existence of which is raised by the law in certain cases upon certain proofs. That is the malice described in the same section of the Penal Code, when it further declares that "malice" is shown by "an intent to do a wrongful act, established either by proof or presumption of law." This is a malice of pleading and proof made necessary by the exigencies of definitions of offenses against the law. This malice may exist with malice in fact; but, upon the other hand, it may exist quite independent of it. In some instances this latter malice—malice in law—is conclusively presumed against the defendant. In other instances the presumption is disputable. Thus, in those jurisdictions where malice, by force of the definition of libel is held to be essential to the action, it is conclusively presumed from the publication. In our own criminal action, it is presumed from the injurious publication alone, but the presumption is disputable and may be overcome by establishing a justifiable motive for the publication. (Pen. Code, sec. 250.) If any terms of description were universally understood and accurately and uniformly employed, there would be no occasion for cavil. But employed, as they are, in different jurisdictions with different meanings, all possibility of accurate reasoning and fair exposition is at once destroyed. In those jurisdictions where malice is of the essence of a civil libel, this malice is considered to be in its nature a pure legal fiction, conclusively established by proof of the falsity and non-privileged character of the published matter. This but introduces another embarrassment in the law, an embarrassment which we need not take upon ourselves, in view of the fact that neither in our pleadings nor in our proof is malice necessary to sustain a charge of civil libel. And it must very often happen that aside from this fictional malice of the law, the constructive malice of the law, presumed from the intentional doing of a wrongful act without just reason or excuse, will exist where there is an entire absence of malice in fact and where the tortious act of libel arose through pure negligence. The instance of *Taylor* v. *Hearst*, above cited, is typical of this class of cases. So, in Bigelow on Torts, 7th ed., sec. 319, it is said: "It is in-

deed common to say that malice is presumed or implied upon proof of the publication; but that means nothing, and is only misleading, for the presumption or implication cannot be overthrown by evidence of want of malice. Malice touching the making of a *prima facie* case is only a name arbitrarily applied, simply a fiction." And Lord Justice Brett, in *Clark* v. *Molyneux*, 3 Q. B. Div. 246, treating of the malice which destroys a qualifiedly privileged communication, says: "Malice does not mean malice in law, a term in pleading, but actual malice, that which is popularly called malice. . . . It has been decided that if the word 'maliciously' is omitted in a declaration for libel, and the words 'wrongfully' or 'falsely' substituted, it is sufficient, the reason being that the word 'maliciously' as used in a pleading has only a technical meaning; but here we are dealing with malice in fact, and malice then means a wrong feeling in a man's mind." So, too, most instructive is the language in *Wrege* v. *Jones*, 13 N. D. 267, [112 Am. St. Rep. 679, 100 N. W. 705], where the court is discussing the malice which the law presumes in civil actions for libel. Says the court: "But the conclusion that, because in such cases it is said that malice is conclusively presumed, evidence upon the question of actual malice (that is, as to the motive or intent with which the publication was made) is incompetent, when offered under a sufficient answer, is entirely erroneous. The malice which by legal fiction is thus presumed to exist is known as 'legal malice,' as distinguished from actual or express malice, or malice in fact. . . . In many cases there may be no malice at all, and no intent to injure, or, at most, thoughtlessness or negligence. It is well settled that in such cases the absence of actual malice will not defeat the action, and the party injured may recover his actual damages. In other words, the absence of malice is never a complete defense. But where actual malice is charged in the complaint, and more than compensatory damages are claimed for the injury—and that is this case—the actual motive or intent with which the publication was made becomes an important, and indeed a vital fact, from which to determine the amount of damages to be awarded." But still further to complicate the consideration, even greater confusion results from the fact that in some jurisdictions the malice which is a legal fiction is termed

"implied malice"—as in New York, where the definition of libel is "a malicious publication," etc. (See *Ullrich* v. *New York Press Co.*, 23 Misc. 168, [50 N. Y. Supp. 788]; *Van Ingen* v. *Star Co.*, 1 App. Div. 429, [37 N. Y. Supp. 114]; *Walker* v. *Best*, 107 App. Div. 304, [95 N. Y. Supp. 151]; *Krug* v. *Pitass*, 162 N. Y. 154, [76 Am. St. Rep. 317, 56 N. E. 526]; *Prince* v. *Brooklyn Daily Eagle*, 16 Misc. 186, [37 N. Y. Supp. 250].) In the last case cited, a protest against the misuse and confounding of terms is voiced in the following language:—

"The confusion in respect of the meaning of the word 'malice' in actions for libel and slander, involved in trying to distinguish between two kinds of malice, whereas there is and can be in such actions only one kind, seems to be preserved now only because it has existed so long, even though against many protests. The only malice there is in actions for libel or slander is such as is proved. When such malice exists, punitive damages may be given for it."

It must therefore be apparent without more prolonged exposition, that even our own law of libel cannot be satisfactorily discussed without an understanding of the meaning that is to be given to words and phrases; and we shall, for the purposes of this discussion, define malice as it is defined by section 7 of the Penal Code,—a state of mind arising from hatred or ill-will, evidencing a willingness to vex, annoy, or injure another person. We shall call this "malice" malice in fact. We shall bear in mind that it may be established either by direct proof of the state of mind of the person, or by indirect evidence so satisfying to the jury that they may from it infer and find the existence of this malice in fact.

We shall define malice in law as being that malice which the law presumes (either conclusively or disputably) to exist upon the production of certain designated evidence, which malice may be fictional and constructive merely, and which, arising, as it usually does, from what is conceived to be the necessity of proof following a pleading, which in turn follows a definition, is to be always distinguished from true malice or malice in fact. The following brief quotations—and they could be indefinitely multiplied—will show how the courts have been compelled to struggle with the meanings and definitions of malice. In *Hemmens* v. *Nelson*, 138 N. Y. 517,

[34 N. E. 342, 20 L. R. A. 440], the court was speaking of the malice necessary to be shown in an action for words uttered under a qualified privilege, the malice which we have designated malice in fact, and it says: "This kind of malice which overcomes and destroys the privilege is of course quite distinct from that which the law in the first instance imputes with respect to every defamatory charge, irrespective of motive." And in *Templeton* v. *Graves,* 59 Wis. 95, [17 N. W. 672], the court, discussing what we have termed malice in fact, under the designation of express malice, says: "Such malice may be inferred from all the circumstances of the case; indeed, it would ordinarily be very difficult to prove its existence by direct evidence. But it is not to be inferred from the facts alone that the words are false and injurious to the plaintiff, although malice is implied from those facts."

*Exemplary damages.*

It has been said that malice is not a necessary ingredient, is no part of the gist of our civil action for malice. No particular harm can be worked by the declaration that malice is a necessary part of every action for libel, if it be understood that the particular malice there referred to is the constructive or fictional malice which we have designated malice in law. There is, however, a general provision of the law allowing punitive damages in the discretion of the jury, in an action not arising from contract—in other words, in any action sounding in tort, "where the defendant has been guilty of oppression, fraud, or malice, express or implied." (Civ. Code, sec. 3294.) Enough has been said to show what a fertile field for error is the language just quoted, when attempt is made to apply it to malice, express or implied, under all their varying definitions. Thus, express malice is sometimes employed synonymously with what we have designated malice in fact. Implied malice is as frequently used to designate the fictional malice of the law. So construed, section 3294 of the Civil Code would allow damages in libel suits in any and every case without regard to the actual existence of malice in fact. The manifest injustice of such an interpretation becomes at once apparent, when it is considered that the publisher of a libel is responsible for compensatory damages, even if the libel be published without his knowledge and against his will or assent, if so published

CLX Cal.—11

by his authorized agents or employees. Such a construction of the law would make him also liable for punitive damages. It should be apparent that the malice, and the only malice, contemplated by section 3294 is malice in fact, and that the phrase "express or implied" has reference only to the evidence by which that malice is established; express malice thus meaning that the malice is established by express or direct evidence going to prove the actual existence of the hatred and ill-will; implied malice referring to the indirect evidence from which the jury may infer the existence of this malice in fact. We say this should be evident from the reading of the section itself, under the maxim of *noscitur a sociis.* It is in those cases where the defendant has been guilty of oppression or fraud, or of a malice akin to oppression and fraud, that punitive damages may be awarded. But throughout the whole history of the law, whatever may be the mode of proving the existence of malice in fact, it is only upon some showing regarded by the law as adequate to establish the presence of malice in fact, that is the motive and willingness to vex, harass, annoy, or injure, that punitive damages have ever been awarded. And this, the adjudications abundantly and without controversy establish.

When consideration is paid to the fact that the sole object of an action at law is to return full compensation in terms of money for a legal wrong inflicted upon a plaintiff, and when in any action a plaintiff has been made whole, in contemplation of law, by the receipt of such an award in damages, it is indeed an anomaly to find that in any case more than full compensation may be awarded him. And it is well said in *Haines* v. *Schultz,* 50 N. J. L. 481, [14 Atl. 488], that "the engrafting of this notion (punitive damages) into personal suits has resulted in an anomalous rule; the doctrine of punitive damages being a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine, but, whether we regard it in the one light or the other, it is the wrongful personal intention to injure that calls forth the penalty." And this is necessarily so, for the law, having made full compensation for the *act,* can thereafter be concerned solely with the *motive* of the act. The wrongful act has been redressed by full compensation. The improper motive which actuated it may be punished by an award of exemplary dam-

ages. "Malice in fact," says this court in *Childers* v. *Mercury Pub. Co.,* 105 Cal. 284, [45 Am. St. Rep. 40, 38 Pac. 903], "is only material in libel as establishing a right to recover exemplary damages, or to defeat defendant's plea that a publication is privileged." And while in the cases this malice, the existence of which we have declared to be essential to a recovery in punitive damages, is sometimes called express malice, sometimes actual malice, sometimes real malice, and sometimes true malice, it is always in its analysis malice of the one kind, the malice of evil motive. (*Witcher* v. *Jones,* 17 N. Y. Supp. 491; *Union Mutual Life Ins. Co.* v. *Thomas,* 83 Fed. 803, [28 C. C. A. 96]; *Miner* v. *Bradstreet Co.,* 170 Mo. 486, [73 S. W. 668]; 18 Am. & Eng. Ency. of Law, 2d ed., p. 1093; *French* v. *Deane,* 19 Colo. 504, [24 L. R. A. 387, 36 Pac. 609]; *Inman* v. *Ball,* 65 Iowa, 543, [22 N. W. 666]; *Miller* v. *Kirby,* 74 Ill. 242; Sedgwick on Damages, sec. 363.) While such malice in fact is essential to an award of exemplary damages, it may be proved directly or indirectly, that is to say by direct evidence of the evil motive and intent, or by legitimate inferences to be drawn from other facts and circumstances in evidence. To this proposition reference may be made to the cases of *Nailor* v. *Ponder,* 1 Marv. (Del.) 408, [41 Atl. 88], and *French* v. *Deane,* 19 Colo. 504, [24 L. R. A. 387, 36 Pac. 609]. Thus, in *Brewer* v. *Jacobs,* 22 Fed. 217, it is said: "It is express malice where the party evinces an intention to do a wrong, and implied where it is inferred from the character of the facts proven." It is precisely in this sense that the words "express" and "implied" are used in the section of the code limiting the award of exemplary damages, and it is no other or different from the malice which must always be established to maintain an action for malicious prosecution. Thus, in *Gonzales* v. *Cobliner,* 68 Cal. 151, [8 Pac. 697], this court quotes from *Harkrader* v. *Moore,* 44 Cal. 153, to the following effect: "Malice in fact must be shown in order to support the action (malicious prosecution) . . . and while the jury may find the fact of malice from the circumstances of the want of probable cause, or from other circumstances established in the case, they are not to be told that a wrongful charge made without probable cause is *per se* malicious in fact." In *Humphries* v. *Parker,* 52 Me. 502, it is said: "There is no doubt that malice in fact, as distinguished from malice in law, is essential to the mainte-

nance of an action for malicious prosecution." And the principle is recognized and announced in the English courts in such cases as *Hicks* v. *Faulkner,* 8 Q. B. Div. 167, where it is said:—

"It is true, as a general proposition, that want of probable cause is evidence of malice; but this general proposition is apt to be misunderstood. In an action of this description the question of malice is an independent one—of fact purely—and altogether for the consideration of the jury, and not at all for the judge. The malice necessary to be established is not even malice in law, such as may be assumed from the intentional doing of the wrongful act (see *Bromage* v. *Prosser,* per Bailey, J.), but malice in fact—*malus animus*—indicating that the party was actuated either by spite or ill-will towards an individual, or by indirect or improper motives, though these may be wholly unconnected with any uncharitable feeling towards anybody."

It should be added that when the Civil Code (sec. 47) speaks of privileged publications, and in section 48 declares that malice is not inferred from the publication of such matters, it means nothing but this malice in fact, as abundantly appears from the authorities above cited, and as is expressly laid down in such cases as *Hemmens* v. *Nelson,* 138 N. Y. 174, [34 N. E. 342, 20 L. R. A. 440], and *Clark* v. *Molyneux,* 3 Q. B. Div. 246. And, finally, it should be remarked that in all classes and kinds of cases in which exemplary damages are sanctioned, there must be made to appear to the satisfaction of the jury, the evil motive, the *animus malus,* shown by malice in fact, or by its allied malignant traits and characteristics evidenced by fraud or oppression.

Indeed, section 41 of our Civil Code affords complete demonstration that it is the *motive alone* and not the *act* that lies at the foundation of an award of punitive damages by providing that "a minor or person of unsound mind, of whatever degree, is civilly liable for a wrong done by him, but is not liable in exemplary damages unless at the time of the act he was capable of knowing it was wrongful."

*Imputed malice in fact.*

Since the *animus malus* must be shown to exist in every case before an award in punitive damages may be made against a defendant, since the evil motive is the controlling and essential factor which justifies such an award, it follows of necessity

that no principal can be held in punitive damages for the act of his agent, unless the particular act comes within the principal's specific directions or general suggestions, or unless the principal has subsequently ratified it, such ratification presupposing, it is said, original authorization. As to specific directions, of course nothing need be said. Under general suggestions would come that class of cases where the policy and conduct of a newspaper show that its proprietor has given his subordinates *carte blanche* to do anything and everything that will make the paper a financial success and demonstrate its superior enterprise as a news disseminator. Herein is implied a willingness of the proprietor to publish libels against anybody, and it would, of course, afford strong evidence of malice in fact, closely allied to oppression, in the case of each victim. Upon this, our own cases present a line of unbroken authority, and the decisions elsewhere are overwhelming. Upon the general proposition reference may be made to *Wardrobe* v. *California Stage Co.,* 7 Cal. 118, [68 Am. Dec. 231]; *Nightengale* v. *Scannell,* 18 Cal. 315; *Turner* v. *North Beach etc. Co.,* 34 Cal. 594; *Wade* v. *Thayer,* 40 Cal. 586; *Warner* v. *Southern Pacific Co.,* 113 Cal. 105, [54 Am. St. Rep. 327, 45 Pac. 187]; *Trabing* v. *California Nav. Co.,* 121 Cal. 137, [53 Pac. 644]; *Nixon* v. *Rauer,* (Cal.) 66 Pac. 221; *Foley* v. *Martin,* 142 Cal. 256, [100 Am. St. Rep. 123, 71 Pac. 165, 75 Pac. 842]; *Railway Co.* v. *Prentice,* 147 U. S. 101, [13 Sup. Ct. 261, 37 L. Ed. 97]; *Western Union Tel. Co.* v. *Brown,* 58 Tex. 170, [44 Am. Rep. 610]. While to the specific proposition that malice in fact is not imputable to the master merely from the act of the employee, reference may be made to *Haines* v. *Schultz,* 50 N. J. L. 481, [14 Atl. 488]; *Detroit etc. Co.* v, *McArthur,* 16 Mich. 447; *Eviston* v. *Cramer,* 57 Wis. 570, [15 N. W. 760]; *Krug* v. *Pitass,* 162 N. Y. 154, [76 Am. St. Rep. 317, 56 N. E. 526]; *Clark* v. *Newsam,* 1 Exch. 131; *State* v. *Mason,* 26 Or. 273, [46 Am. St. Rep. 629, 38 Pac. 130]; 26 L. R. A. 779 and note; and 4 Odgers on Libel & Slander, 367, where it is said:—

"In all these cases the malice proved must be that of the defendant. If two persons be sued the motive of one must not be allowed to aggravate the damages against the other . . . Nor should the improper motive of an agent be matter of aggravation against the principal."

*Burden of proof and nature of proof of malice in fact.*

It follows necessarily from the foregoing that, since malice in fact goes to the state of mind and evil motive of the defendant, the burden of proving the existence of that state of mind is, in every case, upon the plaintiff who seeks an award of punitive damages based upon its existence. The fact, like every other fact in issue, is to be determined by the jury, though there is always the reserved power and duty in the court, in a proper case, to instruct the jury that there is such an absence of evidence of the malice in fact, as to forbid an award in punitive damages. (*Taylor* v. *Hearst,* 107 Cal. 269, [40 Pac. 392]; *Trabing* v. *California Nav. Co.,* 121 Cal. 138, [53 Pac. 644].) As to the nature of the evidence, as has been said, it may be direct (or express, as the code names it), going to declarations, acts, and conduct of the defendant, showing personal ill-will toward the plaintiff, but it will more usually be indirect or inferred (the implied malice in fact of the code definition), and to this end of proving the malice inferentially all legitimate evidence is admissible bearing upon the general course of conduct of the defendant toward the plaintiff, the internal evidence furnished by the character of the libel, and any other specific facts and circumstances not in direct proof of the malice, but from which the existence may be logically inferred, herein including the circumstance, if it be found to exist, of wanton recklessness and heedlessness of plaintiff's rights. When malice in fact is found to exist an award based upon it should bear relation to the gravity of that malice. For, surely, the man who in mere wantonness slaps another upon the cheek is not actuated by the same degree of malice as would be shown, if, brutally, and without provocation, he shot him down.

*Presumptions touching malice.*

Malice in fact does not arise as a legal presumption from the mere falsity and libelous character of the publication. It may be inferred from the intrinsic evidence of malice which the publication affords; but whether it does or not is for the jury to say. The presumptions that an unlawful act was done with an unlawful intent and that a person intends the ordinary consequences of his voluntary act (Code Civ. Proc., sec. 1963) are, in libel, presumptions going to malice in law and not to malice in fact   They are important in libel only in

those jurisdictions where, as has been said, malice is considered as the gist of the action. Says Folkard, (Slander & Libel, 7th ed., p. 206) : "Where a libel has been published of the plaintiff by which actual or presumptive damage has been occasioned, the malice of the defendant is a mere inference of law from the very act; for the defendant must be presumed to have intended that which is the natural consequence of his act. In such instances, therefore, it is unnecessary to give evidence of malice in fact, except for the purpose of enhancing the damages." And Odgers, who, it will be remembered, in his learned work declines to consider the existence of any malice but malice in fact, sums up the English law as follows :—

"Mere inadvertence or forgetfulness, or careless blundering, is no evidence of malice. (*Brett* v. *Watson,* 20 W. R. 723; *Kershaw* v. *Bailey,* 1 Exch. 743; 17 L. J. Ex. 129; *Pater* v. *Baker,* 3 C. B. 831; 16 L. J. C. P. 124.) Nor is negligence or want of sound judgment (*Hesketh* v. *Brindle,* (1888) 4 Times L. R. 199), or honest indignation (*Shipley* v. *Todhunter,* 7 C. & P. 690). That the words are strong is no evidence of malice, if on defendant's view of the facts strong words were justified. (*Spill* v. *Maule,* L. R. 4 Ex. 232; 38 L. J. Ex. 138; 17 W. R. 805; 20 L. T. 675.) That the statement was volunteered, if it was defendant's duty to volunteer it, is no evidence of malice. (*Gardner* v. *Slade et ux.,* 13 Q. B. 796; 18 L. J. Q. B. 336.) That the statement is now admitted or proved to be untrue is no evidence that it was made maliciously (*Caulfield* v. *Whitworth,* 16 W. R. 936; 18 L. T. 527) ; though proof that defendant knew it was untrue when he made it would be conclusive evidence of malice. (*Fountain* v. *Boodle,* 3 Q. B. 5; *Clark* v. *Molyneux,* 3 Q. B. D. 237; 47 L. J. Q. B. 230.) 'If you want to show that a statement was malicious, it is not sufficient to show that it was not true.' (Per North, J., in *Hayward & Co.* v. *Hayward & Sons,* 34 Ch. D. at p. 206; and see the observations of Williams, J., in *Harris* v. *Thompson,* 13 C. B. at p. 352.)"

The only presumption of our law touching malice in fact is that announced in section 1962 of the Code of Civil Procedure, which declares as a conclusive presumption, the existence of "a malicious and guilty intent from the deliberate commission of an unlawful act for the purpose of injuring another." But before this presumption arises, the jury is to find as facts:

(1) the commission of an unlawful act; (2) that its commission was deliberate, and (3) that it was committed with the deliberate purpose of injuring another. In these three findings it will be noted are all the elements of malice in fact.

With the enunciation of these principles and the understanding of these definitions, we may enter upon a consideration of the questions advanced for determination upon this appeal, with reasonable confidence and expectation of conveying a meaning free from uncertainty and doubt.

1. It is argued that the defendant Hearst is not liable for exemplary damages under the evidence. Herein it is said: "The fact that the defendant Hearst was absent from the scene of publication at the time of the publication, did not actually participate therein, and had no knowledge of any of the acts complained of, precluded any award of punitive damages against him." Such a state of facts would unquestionably exempt a newspaper proprietor from liability for punitive damages in the absence of evidence, direct or indirect, that the publication, of libelous matter, though not of the particular libelous matter, was authorized by him, or sanctioned and ratified by him after knowledge of the fact. Plaintiff had established the publication of a series of articles containing grave charges  and reflections upon his official and personal character and conduct. He had shown that the defendant Hearst had affirmed the truth of these charges by justification in his answer. Their falsity upon trial was sufficiently established. These and other facts and circumstances afforded evidence from which the jury could legitimately have inferred the existence of malice in fact, and more proof was required by the defendant to repel this inference than was actually offered. It was not sufficient merely to show—and to this extent only does the showing go—that the defendant was absent from the state and had no foreknowledge of the actual publication of these particular articles. Such a state of facts, in the mind of the jury, could well co-exist with positive instructions to attack the plaintiff's character, leaving it to the employee to select the mode of attack. We are not to be understood as implying that such instructions did exist, but as stating merely the incontrovertible fact that where the evidence offered by the plaintiff is such that from it the jury may infer the existence of malice in fact, the burden is cast

upon the defendant of destroying this inference by proof that neither by general nor particular instructions were the publications authorized, and that neither in fact nor by his conduct were they ratified when knowledge of their publication was brought home to him. To this extent the evidence of defendant failed to go, and for this reason it cannot be said that the evidence of plaintiff was insufficient to sustain a verdict against the defendant Hearst in punitive damages.

2. The court instructed the jury as follows: "You can only give as exemplary damages such sum as you believe to be the amount that should be assessed against the defendant against whom the lowest amount of exemplary damages should be given. If you find that exemplary damages are justified as against only one of them, you must not add anything at all for exemplary damages." This instruction is more favorable to the appellants than the law warrants, and of course the appellants are not here complaining of it; but in contemplation of the new trial which must be ordered it becomes necessary to say that the instruction is mistaken in its law. In an action for compensatory damages against joint tort feasors,—the action contemplated by section 3333 of the Civil Code,—the law will not permit an apportionment of the damages, since it will not attempt to measure the degrees of culpability of the joint tort feasors; nor in an action for malicious prosecution, where the existence of malice in fact must be found against every tort feasor before any judgment can be rendered against him, will the law, for the same reason, admit or permit an apportionment of damages.

Also, in those jurisdictions, as in England, where the verdict must be for a single sum, and there is included in it damages both compensatory and punitive, there can be, from the nature of the practice, but a single verdict against all defendants. But, under our system of procedure where the jury may, and upon the request of defendant, must segregate and make separate awards of compensatory and punitive damages, the reason for the rule we have been considering ceases to exist. There is nothing in our system to prevent the award of compensatory damages against all joint tort feasors who are found culpable, and to add a specific sum or sums, by way of punitive damages, against such of the tort feasors as the jury shall find to have been actuated by malice in fact. Not only is this per-

missible, but it tends to simplicity and avoids the multiplicity of actions which otherwise would become necessary. Peculiarly applicable is this principle to cases of punitive damages sought against both principal and agent, where the agent has been guilty of malice, fraud, or oppression, but where, as above pointed out, the improper motive of the agent is not made matter in aggravation against the principal. There is a scarcity of authority upon this proposition, but we think the principle as we have enunciated it is sound. In *Mauk* v. *Brundage,* 68 Ohio St. 89, [67 N. E. 152, 62 L. R. A. 477], the court had under consideration an instruction to the effect that if the jury awarded exemplary damages they must find that all the defendants had actual malice, and the court says:—

"On the other hand, if it was intended, as we think it was, to instruct that in no event could compensatory damages be awarded against some and exemplary damages against others, then we think the instruction incorrect. Perhaps the question is not without difficulty, but it would appear practicable to allow a recovery of an amount against all as compensatory damages, and a further amount against some as exemplary damages, (and such verdict would be just if the evidence warranted it), and it would not seem impracticable to so shape the verdict as to bring about this result."

This, we think, enunciates the true rule.

3. In connection with, and as a part of its instructions upon the subject of exemplary damages, the court instructed the jury as follows:—

"The proprietor of a newspaper in which a libel is published though he has no knowledge of the publication at the time, is as responsible for it as he would have been had it been done by him personally or under his direct supervision, and it is no defense to a libel that it was published in the absence of the proprietor by an employee, however competent said employee may be."

This instruction is unobjectionable as a rule of law governing the award of compensatory damages in an action for libel. It is misleading and mistaken as a part of the law governing the award of punitive damages, in which latter connection it was employed. The instruction was one proposed and given in the case of *Dunn* v. *Hearst,* 139 Cal. 239, [73 Pac. 138], where the plaintiff was seeking compensatory damages alone.

For support of the soundness of the instruction that court made reference to the case of *Taylor* v. *Hearst,* 107 Cal. 269, [40 Pac. 392], which, as has been shown, was a case not involving punitive damages, and where the instruction to the jury forbade the award of punitive damages.

4. The court instructed the jury as follows:—

"In order to recover exemplary or punitive damages, it is necessary that there should be on the part of the defendant malice toward the plaintiff and this malice is of two kinds: First, express malice, or, as it is known in the law, malice in fact; and, second, that malice which is not connected by any personal feeling on the part of the defendant, but which the law regards as a sufficient invasion of the rights of the plaintiff to sustain exemplary damages by reason of the carelessness, negligence, or willful disregard of the rights of the plaintiff by the defendant as to impute to the defendant what is known in law as implied malice or malice in law, as distinguished from express malice.

"In order to recover exemplary damages, in addition to actual or compensatory damages, it is necessary for you to find from the evidence either express malice or implied malice as above defined on the part of the defendants, or the particular defendant or defendants against whom such exemplary damages are assessed, for without such malice, either express or that which the law implies by reason of the carelessness or negligence of the defendant or defendants, exemplary damages may not be awarded."

It will be noted that by these instructions the trial court defined express malice to be malice in fact, and implied malice to be malice in law, and further declared that exemplary damages could be awarded by the jury upon a finding of either malice in fact or malice in law. That the court in this fell into the common error of confounding the different meanings given to malice, must be apparent from what has already been said. It was the equivalent, as has been pointed out, of telling the jury that malice in law (which is always conclusively presumed from the publication of an article libelous *per se* in those jurisdictions where malice is of the essence of a civil libel) was sufficient as the basis of an award for punitive damages; and thus, in effect, declared that in the case of every false and libelous publication punitive damages could be

awarded. But to remove the question from possible doubt in the minds of the jury, the court further instructed them as follows: "Malice in law is defined as a wrongful act done intentionally without just cause or excuse,"—and thus declared to the jury in terms that punitive damages could be awarded upon their finding of this malice which the law always when necessary conclusively presumes to exist.

What has already been said establishes the serious substantive error of these declarations. But, further the court in the same instruction advised the jury that malice in law consists in that, "which the law regards as a sufficient invasion of the rights of the plaintiff to sustain exemplary damages *by reason of the carelessness, negligence or willful disregard of the rights of the plaintiff by defendant.*" From this the jury could only have understood that the law regards carelessness or negligence as establishing malice in law, and that malice in law will support an award in punitive damages. But the truth is that mere negligence or mere carelessness can never be evidence of malice in fact. In the same act they cannot even co-exist. Malice necessarily imports an evil purpose. Negligence necessarily implies an absence of intent or purpose. The train dispatcher who inadvertently or mistakenly telegraphs instructions from which a wreck ensues, is guilty of no evil motive, but of negligence pure and simple. If he sends the same message designedly there is no element of negligence. He is guilty of malice in fact. It is sometimes said that malice in fact may be inferred from "gross negligence"—a phrase somewhat in vogue in the earlier cases, but now practically abandoned in the learning and literature of the law. (*Milwaukee etc. Ry. Co.* v. *Arms,* 91 U. S. 489, [23 L. Ed. 374] ; *Wilson* v. *Brett,* 11 Mees. & W., 113.) But even in those cases the gross negligence was defined as negligence that evidenced a wanton and reckless disregard of the consequences and of the rights and of the feelings of others. And herein, and by this very definition, it is shown that the gross negligence thus meant in itself displayed an active and evil intent. Thus it is said in *Philadelphia etc. Ry. Co.* v. *Quigley,* 21 How. (U. S.) 202, [16 L. Ed. 73], discussing the liability of a defendant for exemplary damages in a civil action for libel: "Whenever the injury complained of has been inflicted maliciously or wantonly and with circumstances of contumely or indignity, the jury are

not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person, but the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations." And to the effect that negligence is not to be confounded with malice, and that proof of negligence does not justify an inference of malice, see *Moody* v. *McDonald,* 4 Cal. 297; *Yerian* v. *Linkletter,* 80 Cal. 135, [22 Pac. 70]; *Badostain* v. *Grazide,* 115 Cal. 425, [47 Pac. 118]; *Spencer* v. *San Francisco Brick Co.,* 5 Cal. App. 126, [89 Pac. 851]; *Jenkins* v. *Gilligan,* 131 Iowa, 176; 108 N. W. 237, 239; *Arkansas etc. Ry. Co.* v. *Stroude,* 77 Ark. 109, [113 Am. St. Rep. 130, 91 S. W. 18]; *East Tennessee etc. Ry. Co.* v. *Lee,* 90 Tenn. 570, [18 S. W. 268]; *Peterson* v. *Western Union Tel. Co.,* 72 Minn. 41, [71 Am. St. Rep. 461, 74 N. W. 1022, 40 L. R. A. 661].

5. The jury was instructed as follows:—

"If you should find that the article or articles in question was or were published wantonly, recklessly and with an utter disregard as to whether true or false, then I charge you, the plaintiff is entitled to recover exemplary or punitive damages as well as compensatory."

The vice of this instruction is that it tells the jury that, upon finding malice in fact, the plaintiff is *entitled,* as of right, to an award of punitive damages. A plaintiff, upon establishing his case, is always entitled of right to compensatory damages. But even after establishing a case where punitive damages are permissible, he is never entitled to them. The granting or withholding of the award of punitive damages is wholly within the control of the jury, and may not legally be influenced by any direction of the court that in any case a plaintiff is entitled to them. Upon the clearest proof of malice in fact, it is still the exclusive province of the jury to say whether or not punitive damages shall be awarded. A plaintiff is entitled to such damages only after the jury, in the exercise of its untrammeled discretion, has made the award. It follows, therefore, that the courts have felt compelled rigidly to suppress such an invasion of the jury's prerogative, and we find in *Railroad Co.* v. *Castineau,* 83 Ky. 119, that it was held error to instruct the jury that if the defendant was guilty of willful

neglect they *ought* to award punitive damages; in *Hawk* v. *Ridgway*, 33 Ill. 473, it was held error to instruct the jury that they must, after finding the fact, give exemplary damages; in *Boardman* v. *Goldsmith*, 48 Vt. 403, where the evidence was sufficient to support a judgment in exemplary damages, it was held error to instruct the jury that they must give them; in *Ferguson* v. *Moore*, 98 Tenn. 342, [39 S. W. 341], it was held error to instruct the jury that it was *their duty* to award punitive damages; in *Gambrill* v. *Schooly*, 93 Md. 48, [86 Am. St. Rep. 414, 48 Atl. 730, 52 L. R. A. 87], it was held that it was error to reject defendant's instruction "since thereby the jury were practically told that they must give exemplary damages, and, where there is evidence sufficient to uphold a verdict for exemplary damages, the question whether they shall be given or not is one for the jury." Further, says the court: "In no case has a plaintiff any legal right to exemplary damages." In *Railroad Co.* v. *Rector*, 104 Ill. 296, the jury was instructed, as here, that if the plaintiff was wantonly, willfully, and maliciously expelled from the train "then the plaintiff is not limited in his recovery to such actual damages sustained, but plaintiff *is entitled* in addition thereto to such additional damages as the jury may in their judgment assess by way of punishment for such act." In holding the instruction erroneous the court said: "But it is not understood the injured party is 'entitled' to such damages as a matter of right, and that instruction that tells the jury as a matter of law, the injured party is 'entitled' to such damages, goes too far, and is for that reason vicious." To the same effect are *Snow* v. *Carpenter*, 49 Vt. 436; *Kenyon* v. *Cameron*, 17 R. I. 122, [20 Atl. 233]; *Berg* v. *St. Paul City Ry.*, 96 Minn. 513, [105 N. W. 191]; *Burkhardt* v. *Press Pub. Co.*, 130 App. Div. 22, [114 N. Y. Supp. 451]; *Robinson* v. *Superior etc. Co.*, 94 Wis. 345, [59 Am. St. Rep. 897, 68 N. W. 961, 34 L. R. A. 205], where many cases are reviewed; and 25 Cyc. 536. Justification for the giving of this instruction is sought to be found in *Graybill* v. *De Young*, 140 Cal. 328, [73 Pac. 1067]. There this court had under consideration an instruction to the following effect: "If you find that the article in question was published wantonly, recklessly and with an utter disregard as to whether it was true or false, then I charge you that plaintiff is entitled to recover exemplary and also compensatory damages." But in the Graybill

case no attack was made upon this instruction because of the use of the word "entitled." The question was not before the court and therefore was not considered by the court, nor decided by the court. The sole ground of attack on the instruction was that it was directed against the defendant De Young, who, at the time of the publication, was absent in Europe, and knew nothing about it. In answer to this attack it was said that the language employed was general and was designed to "state the general proposition of law as to the circumstances under which punitive damages *may be permitted.*" Elsewhere and repeatedly the jury were told in effect that nothing but compensatory damages could be allowed, "unless they found from the evidence that in publishing the article the defendant, Mr. De Young, was actuated by malice in fact, actual or presumed." At the time of this decision the section touching punitive damages read "malice, actual or presumed," where now it reads "express or implied." In *Childers* v. *San Jose Mercury Pub. Co.,* 105 Cal. 284, [45 Am. St. Rep. 40, 38 Pac. 903], it was held that the malice, actual or presumed, was always malice in fact, and the equivalent of what we have heretofore considered and described as malice in fact, express or implied. (*Hearne* v. *De Young,* 132 Cal. 357, [64 Pac. 576].)

6. Upon the subject of exemplary damages the court further instructed the jury as follows:—

"The defendant is permitted the fullest opportunity to show first, the lack of express malice on his part; and second, such circumstances by way of mitigation as would *overcome the presumption raised by the law of malice* by showing all the steps taken by him prior to the publication of the article, to learn the truth of the charge therein contained in order to relieve him entirely from exemplary damages or to reduce the amount of such exemplary damages as you may from the evidence decide to assess against him."

Circumstances in mitigation are allowed to be pleaded and proved, usually to overcome evidence of malice in fact. Circumstances in mitigation ordinarily have no other place or purpose in an action for libel, the exceptions being the use of evidence in mitigation to rebut evidence of special damage, and evidence of bad reputation to lessen the award in compensatory damages. Therefore, when the court instructed the

jury that the circumstances in mitigation would "overcome the presumption raised by the law of malice," it could only mean the presumption of malice in fact raised by the law. But presumptions are wholly creatures of the law. And unless some law does declare that the presumption of malice in fact is raised or created by certain specific evidence, it is error for the court to do so: 1. Because it is violative of section 19 of article VI of the constitution, which provides that judges shall not charge juries with respect to matters of fact; and, 2. Because there is worked an unlawful invasion of the province of the jury, in that by such an instruction they are told that the law erects from certain evidence a presumption which they are to follow; whereas, in fact, the utmost that the law has done has been to say that from that evidence, the jury may, if it sees fit, draw an inference of the existence of the fact.

"A presumption is a deduction which the law expressly directs to be made from particular facts." (Code Civ. Proc., sec. 1959.) (Therefore, in this state, evidentiary presumptions can be only such deductions as the law enumerates.) "An inference is a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect." (Code Civ. Proc., sec. 1958.) In the case of a presumption the jury must make the deduction which the law directs. In the case of an inference the jury may make any logical, reasonable deduction which the facts permit.

"A presumption (unless declared by law to be conclusive) may be controverted by other evidence, direct or indirect; but unless so controverted the jury are bound to find according to the presumption." (Code Civ. Proc., sec. 1961.)

It is therefore a matter of substance and consequence that the distinction between inferences and presumptions should be carefully maintained. Frequently, the inexact use of the word "presumption" by courts where it is not meant to declare an evidentiary presumption of law, but rather the inference which court or jury draws or may draw, has led to confusion. And this was appreciated by the supreme court of Vermont in *Sheldon* v. *Wright*, 80 Vt. 298, [67 Atl. 807], where it is said: "In view of the doctrine in this state that a true legal presumption is in the nature of evidence and is to be weighed as such, unguarded and inexact expressions about presumptions, should here be scrupulously avoided." In *Kauffman* v. *Maier*,

94 Cal. 269, [29 Pac. 481], this court said: "That deduction called a presumption which the law expressly directs to be made from particular facts is uniform, and not dependent upon the varying conditions and circumstances of individual cases. To weigh the evidence and find the facts in any case is the province of the jury, and that province is invaded by the court whenever it instructs them that any particular evidence which has been laid before them is or is not entitled to receive weight or consideration from them." In *Scott* v. *Wood*, 81 Cal. 398, [22 Pac. 871], it is declared: "Under our system the court is not allowed to instruct the jury as to what inference of fact they are to draw, though of course the court may instruct as to the presumptions which the law draws." In *People* v. *Walden*, 51 Cal. 588, where the court instructed the jury that the possession by the defendant unexplained of certain incriminatory articles raised "a reasonable presumption," etc., it was said:—

"In no view can this charge be sustained. If it be said that it was an attempt to charge in respect to a legal presumption, it was clearly error, since no such presumption would arise from the fact stated, as a matter of law. If it was an attempt on the part of the court to instruct the jury that the existence of one fact in view of the ordinary experience of mankind, and connection of events, must be presumed from the existence of another, this was an interference with what, as we have shown, is the exclusive province of the jury. It was charging the jury 'with respect to matters of fact,' and was in contravention of section 17, article VI of the constitution of the state."

To the same effect is *Jones* v. *Geyser Quicksilver Co.*, 52 Cal. 315; *People* v. *Wong Ah Ngow*, 54 Cal. 151, [35 Am. Rep. 69]; *Helbing* v. *Svea Ins. Co.*, 54 Cal. 156, [35 Am. Rep. 72]; *Wallace* v. *Sisson*, 114 Cal. 42, [54 Pac. 1000]; *Linforth* v. *San Francisco Gas & E. Co.*, 156 Cal. 58, [103 Pac. 320]; *State* v. *Pilling*, 53 Wash. 464, [132 Am. St. Rep. 1080, 102 Pac. 230]; *Stookesberry* v. *Swan*, 85 Tex. 563, [22 S. W. 963]; *Cox* v. *Aberdeen etc. Co.*, 149 N. C. 117, [62 S. E. 884].

Countenance is given to this instruction by the misconception of the language employed in the case of *Childers* v. *San Jose Mercury Printing Co.*, 105 Cal. 284, [45 Am. St. Rep. 40, 38 Pac. 903]. The law governing punitive damages then described the malice as actual or presumed; and we have pointed

out, and the Childers case points out, that that means malice in fact, actual being the equivalent of express, and presumed being the equivalent of implied, as the words are at present employed in section 3294 of the Civil Code. The court was there considering an instruction to the effect: "As I have already charged you, the law presumes the existence of malice from the fact of the publication of the false, unprivileged and defamatory article in the newspaper regarding the person so charged." It is said of the instruction from which the extract is quoted that it correctly tells the jury that if malice in fact, actual or presumed (express or implied) has been proven, exemplary damages may be recovered; but then commits the error of saying that the publication is such that malice is presumed—in other words, conclusively presumed. "This is true of malice in law, but the court in this instruction was dealing with malice in fact as bearing upon exemplary damages, and the presumption of malice in fact from the libelous character of the publication is not conclusive, but disputable." Elsewhere in that case it is with accuracy said of presumed malice (implied malice in fact) that, "It is an inference of fact to be drawn from the libelous character of the publication; and, if the article is libelous *per se,* we see no reason why the law should not declare that upon its introduction in evidence a *prima facie* case of malice in fact is established." Of this last language no criticism need be made; for to say that an inference of malice may be drawn from the character of the publication is quite within the reason of the law. To say that that inference makes out a *prima facie* case does not mean that the jury is bound to find in plaintiff's favor upon such evidence, but that they may do so if the evidence satisfies them. Upon the other hand, however, to say that from those same facts a presumption arises, is to instruct the jury that in the absence of rebutting evidence they not only *may* find for plaintiff, but *must* do so, since, "the jury are bound to find according to the presumption" if not controverted. (Code Civ. Proc., sec. 1961.) In *Tingley* v. *Times-Mirror Co.,* 151 Cal. 1, [89 Pac. 1097], it is said with exactness that the malice in fact "may be proven by the article published itself," but where later the opinion declares that, "where the publication is libelous *per se* the law presumes malice in fact in its publication," the statement is stronger than the law warrants. There is no such pre-

sumption of law declared by our codes or statutes and for the court to say that it exists is for the court itself to usurp the legislative function by creating such a presumption, and then invade the province of the jury by forcing its acceptance upon them. So in *Westerfield* v. *Scripps,* 119 Cal. 607, [51 Pac. 958], the discussion was addressed to the evidence from which malice in fact might be inferred by the jury and to the sufficiency of that evidence in overcoming the positive testimony upon the part of the defendants as to their ignorance of the publication of the original article. It was said with accuracy that this evidence and these facts were circumstances "which the jury could consider as tending to contradict the testimony on behalf of defendants upon the question of malice, and the publication of the article in question was also a circumstance tending to contradict such evidence." And further it is said, "As we have seen, there was evidence upon which the jury were at liberty to find the existence of actual malice; and in that view the question was correctly submitted to the jury." But the expression employed in the opinion that the "publication (of the libelous article) was presumptive evidence of that fact (malice in fact) the burden of overcoming which rested with them" (the defendants) as we have said and shown, overstates the law, if it be construed as meaning that a presumption of law does in fact arise. Such presumption, as we have seen, does not arise. That such a presumption does arise could not be justly said by the court in the absence of a statutory declaration to that effect. And what is meant,—and all that can be accurately stated—is that such evidence is sufficient to support an inference of malice in fact if the jury shall so infer.

The truth is that malice in fact is never presumed, but is always to be proved, and the utmost limit of the law is reached when it is declared that by proof of the unprivileged character of a publication, libelous *per se,* the jury may infer the existence of this malice. (*Erber* v. *Stickler & Dunn,* 12 Fed. 526; *Smith* v. *Singles,* (Del.) 72 Atl. 977; *Todd* v. *Evening Printing Co.,* 6 Penne. (Del.) 233, [66 Atl. 97]; *Nailer* v. *Ponder,* 1 Marv. (Del.) 408, [41 Atl. 88]; *Carpenter* v. *New York Journal Pub. Co.,* 97 N. Y. Supp. 478, 111 App. Div. 266; *Parker* v. *Parker,* 102 Iowa, 500, [71 N. W. 421]; *Wright* v. *Hayter,* 5 Kan. App. 638, [47 Pac. 546]; *McGowan* v. *McGowan,* 122 N.

C. 145, [29 S. E. 97]; *Wyatt* v. *Burdette,* 43 Colo. 208, [95 Pac. 336]; *Ton* v. *Stetson,* 43 Wash. 471, [86 Pac. 668].)

We have heretofore pointed out that the malice in fact to sustain exemplary damages in civil libel is the same malice in fact necessary to support every action for malicious prosecution. Touching this question this court has said: "Malice in fact must be shown in order to support the action, and the instruction as given would seem to mean that such malice must necessarily be inferred from the want of probable cause. . . . The jury *may find* the fact of malice from the circumstances of the want of probable cause, or from other circumstances established in the case. They are not to be told that a wrongful charge made without probable cause is *per se* malicious in fact." (*Harkrader* v. *Moore,* 44 Cal. 144.) And in *Griswold* v. *Griswold,* 143 Cal. 617, [77 Pac. 672], the jury was instructed on the question of malice as follows: "You are instructed that malice is a question of fact for you to determine; but that it may be inferred by you from the circumstances proved, and may be presumed to exist from the want of probable cause." The court, holding this instruction erroneous, said: "This instruction is somewhat ambiguous. If it means that the legal presumption of malice followed proof of want of probable cause, it is erroneous. A jury may infer malice from want of probable cause, but the former is not a necessary legal presumption from the latter." So in the civil action for libel, the jury may infer the existence of malice in fact from the unprivileged publication of a false article, libelous *per se,* as it may infer the fact from other circumstances addressed to this end. But the inference is always an inference to be drawn by the jury, and is not a presumption which the law has made, or which the court can make for the control of a jury. Thus it is said in *McCarthy* v. *Weir,* 113 App. Div. 435, 99 N. Y. Supp. 372: "And the existence of malice is always a question exclusively for the jury. It must be found by them, or the action cannot be sustained. Hence, it must always be submitted to them, to find whether it existed. The court has no right to find it, nor to instruct the jury that they may return a verdict for the plaintiff without it. Even the inference of malice from the want of probable cause is one which the jury alone can draw."

7. The court instructed the jury as follows:—

"When a defendant republishes a libelous charge by making it a record of the court, he does so at his own risk. If at the trial he fails to prove the truth of the parts of the article in his answer alleged to be true and did not in good faith expect to prove their truth, he intensifies the original wrong."

This language was approved in *Westerfield* v. *Scripps,* 119 Cal. 607, [51 Pac. 958], and later in *Dauphiny* v. *Buhne,* 153 Cal. 757, [126 Am. St. Rep. 136, 96 Pac. 880]. The attack upon this instruction is that it declares that the original wrong is intensified under the circumstances given; that this language implies an increase of compensatory damage, whereas the matter is to be considered by the jury only as evidence of the existence of malice in fact to support an award of punitive damages. That such is the purpose, and the sole purpose, for which the evidence may be considered is unquestionable. (*Norris* v. *Elliott,* 39 Cal. 72; *Chamberlain* v. *Vance,* 51 Cal. 75; *Schoonover* v. *Rowe,* 7 Blackf. (Ind.) 202; *Meyer* v. *Bohlfing,* 44 Ind. 238; *Register Newspaper Co.* v. *Worten,* 33 Ky. Law Rep. 480, [111 S. W. 693]; *Sickra* v. *Small,* 87 Me. 493, [47 Am. St. Rep. 344, 33 Atl. 910]; *Murphy* v. *Hobbs,* 7 Colo. 541, [49 Am. Rep. 366, 5 Pac. 119]; *Bee Publishing Co.* v. *World Pub. Co.,* 59 Neb. 713, [82 N. W. 28]; *Wabash Printing & Publishing Co.* v. *Crumrine,* 123 Ind. 89, [21 N. E. 904]; *Browning* v. *Powers,* (Mo.), 38 S. W. 943.) But it does not follow that because the instruction could have been more explicit it is necessarily misleading. In jurisdictions such as England and our own states which still follow its practice, the jury renders a single general verdict, including in its award both compensatory and exemplary damages. It has been the very accurate custom in those jurisdictions to speak of all evidence tending to show malice in fact as evidence in aggravation of damage, since this is precisely the function which such evidence performs. It makes heavier the general award. So, too, upon the theory that there is a direct consequence of malice in fact which justifies the award of punitive damages to the plaintiff as a *solatium,* and not to the state as a *penalty,* and that that direct consequence is the increased mental suffering of plaintiff because of the malice in fact (*Welsh* v. *Ware,* 32 Mich. 84), it is common to speak of evidence of such malice as "intensifying the wrong." It is true that the damages are aggravated

and the wrong intensified in this sense only by the malice in fact, and that compensatory damages as such should not be increased thereby. But we do not think the jury could have failed to perceive the true meaning and application of the phrase in question.

8. The libelous articles contained in various forms the assertion of the existence of rumors reflecting on plaintiff. Thus, "Rumors have been rife for many months that reflect on the management of the public business by the board of education"; "charges of favoritism in the award of public contracts have been hinted at time and again"; "there have been ugly stories afloat of the alleged misconduct in office of men who were expected to be protecting the public school interests." The court refused to admit evidence of the existence and character of these rumors, which evidence, it is insisted, was admissible in mitigation both on the question of compensatory damages, and to negative malice as the foundation for exemplary damages. For neither purpose, however, was the evidence admissible. It is, of course, well settled that defendant may impeach the reputation of plaintiff generally or as to the particular qualities embraced in the libel for the purpose of reducing compensatory damages. But it is equally well settled that he may not do this by showing either rumors of general ill-repute or rumors of ill-repute as to the particular matter charged in the libel. If the rumor exists, and is believed, bad repute would follow from the belief, and this bad repute may be shown. If the rumor exists and is not believed, it does not affect plaintiff's reputation, and is, therefore, valueless in mitigation. (Odgers on Libel & Slander, p. 376.). Nor can the existence of the rumor be shown to negative malice, even if the statement in the libel be predicated upon the existence of such rumor; for if the rumor be true the truth may be proved, and there is an end to the matter. But if it be not true it does not dispel an inference of malice for a defendant to show that he has aided in and added to the dissemination of the defamatory report. Such is the rule in this state, consistently adhered to. (*Wilson* v. *Fitch*, 41 Cal. 363; *Preston* v. *Frey*, 91 Cal. 110, [27 Pac. 533]; *Edwards* v. *Publishing Co.*, 99 Cal. 436, [37 Am. St. Rep. 70, 34 Pac. 128]; *Hearne* v. *De Young*, 132 Cal. 362, [64 Pac. 576]; *Tingley* v. *Times-Mirror Co.*, 151 Cal. 26, [89 Pac. 1097].) The one

relaxation of it noted by Odgers in the English cases is that where on the face of the libel it appears that it was founded on an article in a newspaper, or where in uttering the libel the defendant gave the name of his authority for it—in the one case the defendant may show the newspaper publication and his belief in its truth,—in the other he may show that in fact he was informed by the party named and that he believed the information not, of course, as a defense, but in mitigation to dispel the idea that the defamation originated with himself.

9. The court instructed the jury as follows:—

"You must not return a verdict for this plaintiff unless the evidence convinces you that the said matter referred to or was understood by its readers to refer to this plaintiff."

The defendant requested the following instruction:—

"If you find from the evidence that any of the alleged defamatory matter published in the articles complained of referred to acts of the board of education at a time when the plaintiff was not a member of such board, then the truth or falsity of such matter is immaterial in this action, and you are not to take any such matter into consideration in arriving at your verdict," which the court gave with the following modification:—

"Unless you find that the readers of the paper understood and had a reasonable right to understand from the wording of the articles and the text and context of the several parts thereof, that the same did refer to the plaintiff."

The error assigned in the giving of these instructions is that the actual intent of the defendant is the foundation of his liability, while the instruction made that foundation the understanding of the readers. It is further declared that the effect of the instructions was to make defendants liable for defamatory matter referring to acts of the board of education when plaintiff was not a member of that board, so that reference to him could not have been intended. This all has to do with the following portion of the article above quoted:

"It is only a few years ago that members of the board begged the taxpayers for funds for new schools, specified plainly what they wanted the money for and after getting it voted to their uses as outlined by them, they deliberately used the money for other purposes. These men are prone to talk

of their integrity, but such misrepresentations and juggling of public funds would make a Ruef blush for shame."

It is admitted that there was a bond issue before plaintiff became a member of the board, and one after he became a member. It is admitted that everything touching the latter was regular and proper. It is insisted "that the misrepresentations and juggling" had reference to the bond issue antedating plaintiff's membership on the board, and therefore could not have been intended to refer to him.

The actual intent of defendant to charge the plaintiff becomes of consequence in but two instances: 1. Where the reference to plaintiff is so veiled, obscure, and ambiguous that the jury cannot see and say, without extrinsic evidence, that the plaintiff was aimed at and was injured; 2. Where defendant seeks in mitigation to repel the charge of malice in fact. In the first instance evidence is offered by those who, familiar, as the jury is not, with the veiled allusions and obscure references, testify to their undertsanding that plaintiff was meant. A very learned discussion of the purposes for which evidence of the understanding of the readers of a libel may be considered, is found in *Smart* v. *Blanchard,* 42 N. H. 137, decided in 1860, but the earlier cases have been much modified, and the rule now stands more in consonance with reason. The rule is that the question under such circumstances is not one of defendant's intent. It is not, did the defendant intend to injure plaintiff, but did he in fact injure plaintiff's reputation? (Folkard on Libel & Slander, 7th ed., p. 77.) The inquiry is not as to the meaning intended to be conveyed, but as to the meaning in fact conveyed. (*Fisher* v. *Clement,* 10 B. & C. 472.) Says Folkard (Slander & Libel, 7th ed., p. 276): "But where the libel is covertly expressed or ambiguously worded, evidence is required to show that the plaintiff is the party to whom it applies, or was intended to apply. But whatever the intention, if the jury find that any person to whom it was published would understand it as applying to the plaintiff, that will be sufficient to sustain the verdict." As to the second employment of evidence of intent, whether the reference in the libel be ambiguous or not, defendant may offer evidence that he did not intend to refer to the plaintiff, to negative malice in fact. Upon this nothing further is required than a reference to *Taylor* v. *Hearst,* where the libel clearly referred

to plaintiff, but the intent to refer, not to him, but to another, was established to destroy any inference of malice.

If it can be said that in the case at bar ambiguity exists it did not arise from the fact that plaintiff was not a member of the board at the time of the bond issue, which defendants plead was the only one meant. If defendants had in terms charged that plaintiff was a member of the board of education in 1904, and that the members of the board "juggled funds" in a way "that would make Abe Ruef blush with shame," it would raise no ambiguity if defendants pleaded and proved that plaintiff was not a member of the board at that time, and so argue therefrom that there could have been no intent to refer to him. The whole article was before the jury, with its declarations that the "school graft would make a Ruef blush"; that "a Pasadena citizen declares education board has juggled funds for years"; that "it is true that there have been allegations of graft made freely in connection with almost every expenditure of the school funds for several years past, both with the present and previous board of education"; and that "M. W. Davis, clerk of the board, is generally regarded as the worst offender against the public interests in connection with the schools." The jury was therefore properly charged that it was for them to say whether the newspaper article would be understood by its readers as referring to plaintiff. Nor was the testimony of outisde readers to this point required. The jurymen themselves became the readers. No other evidence was offered or needed than the article itself.

10. The court allowed evidence upon the hearing of plaintiff's case in chief to the effect that he bore a good reputation. That affirmative evidence of good reputation in advance of any attack upon it by defendant is inadmissible, is supported by a practical unanimity of authority. (*Morgan* v. *Barnhill,* 118 Fed. 24, 55 C. C. A. 7, and note; *Shipman* v. *Burroughs,* 1 N. Y. Sup. Ct. 442; *Chubb* v. *Gsell,* 34 Pa. 114; *Blakeslee* v. *Hughes,* 50 Ohio St. 490, [34 N. E. 793]; *Hitchcock* v. *Moore,* 70 Mich. 112, [14 Am. St. Rep. 474, 37 N. W. 914]; *Miles* v. *Vanhorn,* 17 Ind. 245, [79 Am. Dec. 477]; *Hall* v. *Dairy Co,,* 15 Wash. 542, [46 Pac. 1049]; *Kennedy* v. *Holladay,* 25 Mo. App. 503; *Copper* v. *Phipps,* 24 Ore. 357, 22 L. R. A. 836, 33 Pac. 985]; *Mayo* v. *Samples,* 18 Iowa, 306; *Houghtaling* v. *Kilderhcuse,* 1 N. Y. 530; *Wright* v. *Schroeder,* 2 Curtis, 548, [Fed. Cas.

No. 18,091]; Odgers on Libel & Slander, p. 366; Folkard on Libel & Slander, p. 260.) There is nothing in our decisions to lend support to the contrary view. In *Edwards* v. *San Jose Printing & Pub. Society,* 99 Cal. 431, [37 Am. St. Rep. 70, 34 Pac. 128], relied upon by respondent, it is said that "The defendants were entitled to an instruction, if they requested it, that, in fixing the amount of damages, the jury might consider the previous character of the plaintiff as they might believe it to be from the evidence." This was in a case where the plaintiff's reputation had been attacked by the defendant and the attack met, or attempted to be met by the plaintiff. Of course, in such a case either party is entitled to such an instruction as this court was there considering. In *Turner* v. *Hearst,* 115 Cal. 394, [47 Pac. 129], no question of reputation was involved, nor was any evidence addressed to it. The court merely declared that in estimating general compensatory damages, the jury was entitled to know "plaintiff's position and standing in society, and the nature and extent of his professional practice." The rule of all the authorities is that the good reputation of the plaintiff is assumed, and that he can, and must, rest upon this until his reputation is attacked. "The plaintiff cannot give evidence of general good character in aggravation of damages merely, unless such character is put in issue on the pleading, or has been attacked by the cross examination of the plaintiff's witnesses; for until then the plaintiff's character is presumed good." (Odgers on Libel & Slander, p. 366.) In this case the defendants did not attack the plaintiff's reputation. They were entitled to have the case of plaintiff rested upon the presumption of good reputation which the law accords. Yet the court instructed the jury as follows:—

"There has been evidence given as to the reputation of the plaintiff prior to the publications involved in this case, and it is for you to determine from the evidence whether or not plaintiff bore a good reputation for honesty and integrity in the community where he lived prior to the time of the publication. A man with a good reputation for integrity and honesty could be more seriously damaged by such publication than would be a man having a bad reputation for honesty and integrity."

11. The third cause of action was based upon an alleged

libel, fully quoted above. It will be seen that the headlines
charged that the mayor investigated the board of education's
acts and the "exposures made by *Examiner* were found to
be true." The body of the article seemingly contains but one
specific matter which the mayor investigated—the making
copies of the bills, etc., by plaintiff. The mayor of Pasadena
was called as a witness, and the court permitted him to be
specifically examined as to the "exposures" and as to the mat-
ters which he found to be true. Thus, he was asked whether
in his investigation of the affairs of the school board he had
found any school graft or any graft at all; whether he had
found any misappropriation of moneys or school funds, with
much other matter of the same import. To all these inquiries
the mayor answered in the negative, testifying in effect that
he had discovered no wrongs or improprieties, and had never
reported that he had discovered them. All of this evidence
was admitted under objection, though it was subsequently,
upon the court's own motion, stricken out. It is to be noted
in this connection that the statement in the publication is gen-
eral, that the mayor had investigated the acts of the board of
education, meaning all the acts which had been charged in
the paper, and that the exposures, meaning all the exposures
which the paper had made or purported to have made, had
been by the mayor found to be true. While the falsity of
defamatory matter will be presumed, still it is competent for
the plaintiff, if he so desires, to offer affirmative evidence
showing that falsity. It was therefore competent for the
plaintiff to show the fact that in that investigation which the
mayor made, he did not find the exposures to be true, and did
not so report. This evidence, of course, was not to be consid-
ered by the jury upon the question of the truth or falsity of
the matters themselves, but was pertinent to be considered
upon the question as to whether the mayor, as published, did
find the exposures to be true and did so report. The mere
fact that in the body of the article the mayor's investigations
are limited to a single charge is not controlling. The captions
and headlines of a libelous article are themselves a part of the
libel. (*Bishop* v. *Latimer,* 4 L. T. 775; Odgers on Libel &
Slander, p. 109.)

12. The court excluded certain offered evidence in mitiga-
tion, upon the ground that the offered evidence had not been

pleaded in mitigation. The case, in short, was tried upon the theory that the defendant could prove in mitigation only that which he had pleaded in mitigation. Aside from the question as to whether some of the offered evidence was competent evidence in mitigation, the court's ruling that no evidence could be received in mitigation, unless pleaded, first demands attention. The code provision upon the subject is found in section 461 of the Code of Civil Procedure, where it is said: "The defendant may, in his answer, allege both the truth of the matter charged as defamatory, and any mitigating circumstances, to reduce the amount of damages; and whether he prove the justification or not, he may give in evidence the mitigating circumstances." This is a re-enactment of section 63 of the earlier Practice Act. It will be found that this section is a remedial section, and as it is the duty of a court in dealing with remedial statutes so to construe them as to suppress the mischief and advance the remedy, the mischief which the statute sought to suppress, and the method by which it may be suppressed, must first be clearly understood. To this understanding, a consideration of the common law rules becomes necessary. At common law, if a defendant proposed to plead *in bar of the action,* he alleged that his utterance or publication was true. This was the plea of justification, and, if successfully maintained, resulted in a verdict in his favor. But the plea was a dangerous one, in that it was required that "the justification should be as broad as the libel," and if the justification failed in any material particular, malice in fact to aggravate the damages was conclusively presumed against the defendant. Resort to the plea of justification was, therefore, never had except in the clearest of cases, and the defendant usually rested his defense upon the general issue under which he was allowed to prove any circumstances repelling the inference of malice in fact, thus mitigating the damages. All of this class and kind of evidence became known as evidence in mitigation. It did not constitute a *defense* to the action, since evidence offered in mitigation necessarily admitted the falsity of the publication, the offer being merely to dispel from the minds of the jury a belief in the malicious character of the utterance. As these circumstances in mitigation did not constitute a defense, they were not pleaded, and, indeed, under the English system, could not have been pleaded. They were

probative facts, and, therefore, had no place in a pleading. It was always permissible for a defendant, amongst other circumstances, in mitigation to show that at the time of his utterance or publication he entertained an honest belief in the truth of the matter charged, and to give evidence of the foundations upon which that belief rested. Thus, it was always permissible, under the general issue, to prove facts and circumstances going to the truth of the matter charged, even if they completely established the truth. Not, as has been said, in bar of the action (for to work this result a plea in justification was necessary), but by showing the solid and substantial foundation for the belief, to dispel, as has been said, the idea that defendant was actuated by malice. Such continued to be the English rule until the case of *Underwood* v. *Parks,* 2 Strange, 1200, was decided by the judges. There the defendant, under the plea of not guilty, offered to prove the truth of the words, in mitigation of damages. The chief justice refused to permit it, saying: "At a meeting of all the judges upon a case that arose in the common pleas, a large majority of them had determined not to allow it for the future, but that it should be pleaded, whereby the plaintiff might prepare to defend himself, as well as to prove the speaking of the words." Here, for the law of libel, was the opening of a Pandora's box of evils. The case soon came to be construed (or misconstrued) as forbidding, under the general issue, not alone truth, but any evidence tending to establish the truth. What, then, was the result? The defendant could no longer offer any evidence tending to establish the truth in mitigation, and thus could offer no evidence in support of his declaration of his good faith and honest belief in the truth at the time of the publication. If, on the other hand, forced out of this opportunity, he had resort to the plea of justification, he did so under the grave peril of having malice in fact conclusively presumed against him by a failure fully to justify. Since failure fully to justify was regarded as conclusive evidence of malice in fact in aggravation of damages, it followed, necessarily, that, having pleaded justification, he was put to his proof upon it at the outset. If he failed then, no evidence in mitigation of any kind was available to him, because of the conclusive presumption of malice which sprang up by reason of his failure. If he successfully established his justification,

then no evidence of any kind in mitigation was necessary. Such was the condition at common law in England, and in the states of the United States which made the common law the basis of judicature. The grave hardship to defendants was recognized and severely denounced. Instructive upon this point are such cases as *Bush* v. *Prosser,* 11 N. Y. 346; *Bisbey* v. *Shaw,* 12 N. Y. 67; *Huson* v. *Dale,* 19 Mich. 17, [2 Am. Rep. 66], and *Van Derveer* v. *Sutphin,* 5 Ohio St. 293. It is appropriate here to quote the learned Justice Selden in *Bush* v. *Prosser,* 11 N. Y. 346.

"First, then, malice was presumed from the falsity of the charge; to this the plaintiff might superadd proof of positive malice, and thus aggravate the damages, while the defendant was precluded, by the rule which excluded all proof of facts tending to establish the truth of the charge, from giving any evidence to rebut malice in mitigation. Upon what did this rule of exclusion rest? Certainly, not upon the *intrinsic impropriety* of the evidence. This is clear from the positions already established. It must have had some other foundation: what was it? The answer to this question is both simple and certain. The rule is merely an unforeseen consequence of that which excluded proof of *the truth of the charge,* under the general issue, in mitigation of damages; a rule which originated with the case of *Underwood* v. *Parks,* 2 Strange, 1200. The courts have implicitly followed that case, without even seeming to consider that the rule it laid down was not only a departure from the principles of the common law, and a pure piece of judicial legislation, but that, in its consequences, it must necessarily deprive defendants of all power to mitigate the verdict.

"Prior to that case, defendants in this class of actions were permitted to prove not only the absence of malice, but *the truth of the charge itself,* in mitigation. This is shown by the case of *Smithies* v. *Harrison,* (1 Lord Raym, 727). The reception of this evidence was in perfect accordance with the general principles of law. Courts have, sometimes, in their speculations upon this subject, seemed to suppose that there was some inherent legal objection to proving, *in mitigation merely,* that which might amount to a *justification;* and have applied the rule which excludes proof of the truth of the charge in mitigation, as though that were its foundation. This, however, is an obvious error. It was never any objection to evi-

dence in mitigation, that under a different state of the pleadings, it would amount to a full defense; the rule in *Underwood* v. *Parks* was not put upon any such ground. That was an action of slander; the defendant, under the plea of not guilty, offered to prove the words to be true, in mitigation of damages; the chief justice refused to permit it, saying that 'At a meeting of all the judges upon a case that arose in the common pleas, a large majority of them had determined not to allow it *for the future,* but that it should be pleaded, whereby the plaintiff might be prepared to defend himself, as well as to prove the speaking of the words.' The very terms here used show, that this was the introduction of a new doctrine by the common consent of the judges. It is clear, from the reason given, that the intrinsic propriety or impropriety of the evidence had nothing to do with the adoption of this rule. It was a rule of pleading merely; having no other object than to prevent plaintiffs from being taken by surprise, upon the trial, by evidence of the truth of the charge. It was not designed to deprive defendants of the benefit of such evidence, or any evidence; but simply to secure due notice to the plaintiff of what he would be required to meet. This was all very well, in cases where the defendant was prepared to justify, which cases alone the judges had in view in adopting the rule; but when the doctrine came to be applied to cases where all the defendant could or desired to do was to mitigate the damages, by showing the absence of malice, it operated unjustly. It took away the right altogether, since the rules of pleading did not allow anything short of a complete defense to be spread upon the record. The whole difficulty would have been obviated, if the judges had simply added to this rule a clause, permitting defendants to give, with the general issue, a notice of the facts intended to be proved in mitigation of damages. It would have been no greater stretch of power to have done this than was required to prescribe the rule itself. But they evidently failed to foresee the conflict which must necessarily arise between the *conceded right* of the defendant to mitigate the damages, by showing the absence of malice, and *the rule* they adopted; a conflict which can be clearly traced from that day to the present. The *right* and the *rule* were directly repugnant to each other, and no question has ever given rise to a more protracted struggle.

"The courts, in England, under a sense of the admitted right, have, in a number of cases, decided that facts and circumstances *falling short of proving,* although tending to prove, the truth of the charge, might be received in mitigation. (*Knobell* v. *Fuller,* Norris' Peake, Append. 32; *Leicester* v. *Walter,* 2 Camp. 251.) But the courts in this state and in Massachusetts, with less justice but better logic, have uniformly held that a rule which excluded proof of the truth of the charge *must necessarily* exclude evidence tending to prove it. But it is a little surprising to observe how often judges have asserted in the same paragraph, both the *right* to mitigate by disproving malice, and the *rule* which effectually precluded the exercise of the right, without any apparent consciousness of the conflict between the two. I will refer to a few only out of the many instances. In the case of *Root* v. *King* (7 Cowen, (N. Y.), 613, Judge Savage says that the defendant 'May show in evidence, under the general issue, by way of excuse, anything short of a justification, which does not necessarily imply the truth of the charge or tend to prove it true, but which repels the presumption of malice arising from the fact of publication.' The same judge, in *Purple* v. *Horton,* (13 Wend. (N. Y.) 9, [27 Am. Dec. 167]), says: 'Facts and circumstances may be shown in mitigation, when they disprove malice, and do not tend to prove the charge, or form a link in the chain of evidence to prove a justification.' Again, Judge Bronson, in *Cooper* v. *Barber,* (24 Wend. (N. Y.) 105), says: 'Facts and circumstances which tend to disprove malice by showing that the defendant, though mistaken, believed the charge true, when it was made, may be given in evidence in mitigation of damages; but if the facts and circumstances offered tend to establish the truth of the charge, or form a link in the chain of evidence going to make out a justification, they are not admissible in mitigation of damages.' It does not appear to have occurred to either of these eminent judges that there was any incongruity between the two branches of the proposition thus asserted by them. But it is certainly difficult to comprehend how a defendant is to disprove malice by showing 'that he believed the charge true, when it was made,' without giving evidence tending to establish its truth; since a belief based upon information derived from others cannot be shown."

· It is to be noted that one of the just complaints made by the courts of the hardship thus worked to defendants was that, under the English system, where nothing but a complete defense was allowed to be pleaded, defendants were not allowed to plead their honest belief, and the foundations for it, and, of course, under the interpretation of *Underwood* v. *Parks* they could not prove anything which tended to establish the truth. It was recognized that the rule in this regard must be relaxed. It was relaxed in some jurisdictions by declarations that, to show honest belief, evidence under the general issue could be given, even if that evidence went to establish the truth of the charge, so long as it did not fully establish the charge. It was met in other jurisdictions, such as our own, by statutory provision, allowing the defendant to *plead,* in mitigation, his belief in the truth of the charge and his foundation for that belief. So the section of the code, in the light of the evil sought to be remedied, is not to be construed as allowing the circumstances in mitigation going to the truth of the charge to be pleaded and proved *only* where justification is pleaded, but it is to be construed as a declaration quite foreign to and in derogation of the common law rule, that even where justification is pleaded the defendant still may prove facts and circumstances going to the truth of the charge in mitigation of damages, or, in other words, to negative malice in fact. It is clear, therefore, that the design of the section was to correct the abuses and broaden the rules of common law. It was not designed to narrow those rules. But it is to be remembered that at common law, even under its narrowest and harshest doctrine, it was always permissible, without pleading, to prove any and all other circumstances in mitigation that did not go to establish the truth of the charge. To construe section 461, therefore, as meaning that in this state, whenever *any circumstances* in mitigation are relied on, they must first be pleaded, is to that extent a contraction of the common law rule. What the section then means is, to summarize, this: If a defendant pleads justification, he may at the same time plead with his affirmance of good faith and honest belief all facts and circumstances within his knowledge at the time of the publication which support that knowledge and belief, even if they tend to establish the truth of the charge. Moreover, if he desires to plead justification, and also the truth or partial truth in

CLX Cal.—13

mitigation, he must plead these facts and circumstances in mitigation, in which event they will be considered (as they never were or could have been at common law after *Underwood* v. *Parks*). Even if the justification fails these matters will be considered by the jury upon the question of malice. Moreover, as at common law after *Underwood* v. *Parks,* there was much contrariety of opinion as to whether evidence tending to prove the truth of the charge could be given under the general issue, the code provision is designed to declare the rule that such evidence if it goes to the truth of the charge, may be proved but must be pleaded. But, upon the other hand, where the common law itself was liberal, the code section was not designed to impair that liberality, and as at common law all other circumstances in mitigation, excepting those tending to establish the truth of the charge, could be proved under the general issue, so in this state all other circumstances in mitigation may be so proved without pleading them.

Thus, at great length, though we trust not at unnecessary length, we come to a consideration of the evidence rejected in this case. But before taking up that consideration it is proper to add that the plea in mitigation considered in *Tingley* v. *Times-Mirror Co.*, 151 Cal. 1, [89 Pac. 1097], is precisely such a plea as we have said the section of the code contemplates *must* be made; that it to say, it was a plea directed to showing the good faith and honest belief of the defendant at the time of the publication, with the facts and circumstances upon which the belief was founded. But there is in this case no declaration and no intimation to the contrary of what has been here stated,—namely: that circumstances in mitigation, other than those which go to establish the truth of the libel, need not be pleaded.

Certain of the evidence rejected was evidence of the existence of rumors. If, in fact, evidence of the existence of rumors was admissible in mitigation, as the mere existence of rumors does not go to the truth of the charge, the evidence would be admissible without pleading; but, as has been before shown, the evidence of rumors was not under the circumstances admissible at all. This, of course, is not in derogation of the rule which permits evidence to be given of a reliable source of information, and the due investigation of the matter before publication. (*Tingley* v. *Times-Mirror Co.*, 151 Cal. 1, [89

Pac. 1097].) Evidence was rejected which was offered to show that in other respects than in those specified in the articles, the recommendation of the plumbing inspector and health officer had been disregarded by the board of education. This evidence was offered in mitigation as tending to prove the truth of the charge of loose methods, etc. Therefore, it could and should have been pleaded in mitigation with an allegation of the knowledge of the defendants of the fact at the time of the publication. For there is this broad distinction between a plea in justification and evidence of the truth given in mitigation: the truth whenever discovered is a complete defense to the defendant. But to repel the conception of malice in the publication, only so much of the truth as the defendant knew at the time of the publication can avail him. The same ruling of the court was proper in reference to evidence directed to specific acts of favoritism which had not been pleaded in justification. The offered evidence to show that the manner of filing demands from the school board and the delivery of the warrants in favor of the claimants had been changed since the publication, could not, of course, be evidence tending to repel the existence of malice at the time of the publication. And if the charge against plaintiff in this regard was libelous, the evidence could only be considered as tending to show the truth of the charge and was properly rejected as not having been pleaded in mitigation. Evidence to substantiate the charge that plaintiff as a member of the school board, gave out false information, could have been shown under a plea in mitigation specifically naming the persons to whom such false information was given. (Odgers on Libel & Slander, p. 591.) But in the absence of such a plea in mitigation, the evidence was properly excluded.

There was given to the jury, as an instruction, an argumentative discussion by this court in *Dauphiny* v. *Buhne,* 153 Cal. 757, [126 Am. St. Rep. 136, 96 Pac. 880], where there was under consideration the question of qualified privilege as a defense to libel—a question not in this case at all. In the Dauphiny case it is pointed out that "it is always injudicious to take the language of a court, in discussing a proposition of law, as correct instruction to be given to a jury." This is necessarily so, for it is always proper and frequently imperative upon a court of review, in answering arguments *pro* and

*con,* itself to indulge in argumentative discussion, which is appropriate to the question under consideration, but has no place in an instruction to a jury. Moreover, it frequently happens that the legislature passes an unjust law, which sleeps upon the books until such time as this court is called to rule upon it. In declaring the law as the legislature has enacted it, it is proper for the reviewing opinion to point out the hardship or injustice which the law may work, as being a most appropriate way of advising the legislative department of its need of correction or amendment. An instance of this, indeed, may be seen in this very case, in the language of Seldon, J., quoted from *Bush* v. *Prosser,* 11 N. Y. 346. But it does not follow that because a reviewing court may point out the hardship and injustice of an existing rule of law, primarily to the end that the legislative attention may be directed to it, the same statements can be made by a trial judge to the jury, where the effect of them would be an implied invitation to the jury to disregard the law because of its injustice. So, in this case, the argumentative discussion of this court, dealing with the question of qualified privilege, has no place in an instruction to a jury, especially in a case where no such question of privilege is involved.

We have thus considered all of the questions presented which appear to merit attention, in contemplation of the new trial which must be ordered, and for the reasons given, the judgment and the order denying a new trial are reversed and the cause remanded.

Shaw, J., Angellotti, J., Lorigan, J., and Melvin, J., concurred.

Rehearing denied.